ROGER GRIMMING, Plaintiff-Appellee, v. THE ALTON AND SOUTHERN RAILWAY COMPANY *et al.*, Defendants-Appellants (Trinity Industries, Inc., *et al.*, Appellees).

Fifth District   No. 5—89—0157

Opinion filed October 18, 1990.

Joseph P. Conran and Mark G. Zellmer, both of Husch, Eppenberger, Donohue, Cornfeld & Jenkins, of St. Louis, Missouri, for appellant Monsanto Company.

Donald J. Dahlmann and James C. Cook, both of Walker & Williams, P.C., of Belleville, for appellant Alton & Southern Railway Company.

Stephen W. Thomson and Kevin J. Babb, both of Reed, Armstrong, Gorman, Coffey, Thomson & Gilbert, P.C., of Edwardsville, for appellee Trinity Industries, Inc.

Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville (Richard E. Boyle and Timothy E. Kastner, of counsel), for appellee St. Louis-Southwestern Railway Company.

Thomas Q. Keefe, Jr., of Cook, Shevlin, Keefe & Ysursa, Ltd., of Belleville, for appellee Roger Grimming.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendants, the Alton and Southern Railway Company (hereinafter Alton & Southern) and the Monsanto Company (hereinafter

Monsanto), appeal from a judgment of the circuit court of St. Clair County entered on a jury verdict in the amount of $3,825,607 for plaintiff, Roger Grimming. The jury verdict and final judgment also determined the *pro rata* share of damages between defendants. Alton & Southern's damages were assessed at 25%, while Monsanto's damages were assessed at 75%. The trial court denied both defendants' post-trial motions and vacated an earlier order allowing both defendants leave to file third-party complaints seeking contribution from Trinity Industries, Inc. (hereinafter Trinity). The trial court also vacated its earlier order granting leave for Monsanto to file a third-party complaint against the St. Louis-Southwestern Railway Company (hereinafter the Cotton Belt). Defendants appeal both the verdict on which final judgment was entered and the final orders barring contribution from Trinity and the Cotton Belt. We affirm.

The facts in this case are complicated, but for the most part are not in dispute. The dispute arises over who is liable for plaintiff's injuries. The record indicates that on June 10, 1985, plaintiff, while employed as a switchman for Alton & Southern, stepped on the BR sill step of a railroad tank car, identified as the MONX 14078, and sustained serious injuries when the sill step gave way under his weight. Plaintiff testified that after he fell and was lying on the ground, he noticed that the sill step did not have a nut on the right side. Prior to mounting the sill step, plaintiff looked down to inspect the sill step and it appeared to be "fine," as bolts were in place; however, after five to seven seconds, the sill step gave way causing him to fall. Plaintiff sustained serious injuries to his back which required hospitalizations on three separate occasions and major surgery—a laminectomy and posterior lumbar interbody fusion. Plaintiff has been in constant, severe pain since this accident. He has lost some sensation in parts of his leg and requires a brace on his right leg. He also walks with a cane and most likely will be required to use both the cane and the brace for the rest of his life. Plaintiff also suffers from impotency due to severe pain in his back. He is totally disabled and will never work again. Plaintiff did have a prior history of back trouble which we will discuss later. Neither defendant offered any medical evidence or any economic evidence bearing on plaintiff's prior history of back trouble, plaintiff's pain and suffering, disability, medical expenses or lost wages, nor did defendants offer any evidence that plaintiff's condition would improve. Defendants did not suggest an amount of damages that would fairly and adequately compensate plaintiff.

Plaintiff's economic expert, Dr. Leroy Grossman, testified that up to the date of trial, plaintiff, who was 42 years of age, suffered a loss

of $112,124 in lost wages. He opined that the present cash value of plaintiff's future lost earnings was $611,040 if plaintiff retired at age 62. If plaintiff worked until age 66, that figure rose to $713,483.

The rail car in question, the MONX 14078, had sill steps at each of its four corners. The ends of the rail car are labeled "B" for the end with the brake and "A" for the end opposite where the brake handle is located. The corners of the rail car are then labeled left and right. "BR" designates the right side of the brake end, "BL" designates the left side of the brake end, "AR" designates the right side of the opposite end, and "AL" designates the left side of the opposite end. Sill steps are provided so that a person climbing on or off the car has an intermediate step to help boost him to the rail car or lower him to the ground. The sill steps were designed to be connected to the rail car by two huck fasteners, one at each end of the step. A huck fastener performs the same function as a nut and bolt, but unlike a nut and bolt, the huck fastener merges into one piece upon installation.

Trinity built a series of 90 tank cars in Texas for Monsanto in 1980, one of which was the MONX 14078. Clinton Marsh was hired by Monsanto to supervise Trinity's building of the tank cars and would make scheduled trips to Texas to observe the actual construction. It was Marsh's job to bring to the attention of Trinity any defects or violations of building rules with respect to the tank cars. Monsanto's purchase order to Trinity for the tank car lot including MONX 14078 stated, in pertinent part:

> "These cars to be built to DOT and AAR-approved specifications and as outlined in the tank car specifications attached to your letter of No. 30, 1979 with exceptions and additions as shown below ***."

The purchase order also provided:

> "Trinity will give Monsanto full opportunity to inspect cars during all stages of construction at Trinity's plant[s] ***. Each inspection certificate, with respect to cars covered thereby, shall, except for latent defects, be final and conclusive evidence that such cars conform in workmanship, material and construction, and in all other respects to the requirements and provisions of this Purchase Order."

DOT refers to the Department of Transportation, and AAR refers to the Association of American Railroads Interchange Rules. The AAR rules govern the requisite equipment that must be placed on rail cars purchased by a company and then offered into interchange. Marianna Stanek, who purchases rail cars for Monsanto's rail fleet, testified

that the rail cars she purchases must comply with AAR rules and that Monsanto is a signatory of the AAR rules.

The Interchange Rules of the AAR provide:

"1. These rules are formulated in two manuals designated Field Manual and Office Manual as a guide to the fair and proper handling of all matters contained therein for the interchange of freight traffic with the intent of:

(a) making car owners responsible for and therefore chargeable with the repairs to their cars necessitated by ordinary wear and tear and fair service, safety requirements and by the Standards of the Association of American Railroads."

Rule 1 of the Interchange Rules also provides:

"1. Inspection

A. Each railroad is responsible for the condition of all cars on its lines.

2. Repairs

A. System cars should be repaired by car owner insofar as may be practicable."

Rule 88 of the Interchange Rules provides:

"Rule 88—Interchange of Freight Cars
* * *

12. Safety Appliances

(a) All cars must conform to the requirements of the Code of Federal Regulations. Title 49, Part 231—Railroad Safety Appliance Standards"

Title 49, Part 231, of the Code of Federal Regulations (CFR) provides, in pertinent part:

"(4) *Manner of Application* (i) Sill steps exceeding 21 inches in depth shall have an additional tread.

(ii) Sill steps shall be securely fastened with not less than ½-inch bolts with nuts outside (when possible) and riveted over, or with not less than ½-inch rivets." 49 CFR §§231.1(d)(4)(i), (d)(4)(ii).

The Trinity design drawings for the MONX 14078 show that the sill steps are to be fastened with huck bolts having the "collar" on top, but plaintiff's exhibit No. 10, a photograph of the MONX 14078 taken after the accident, shows that the bolt head rather than the collar is on top, the opposite of the design drawing. The design drawings and 49 CFR, Part 231, both require the collars of huck fasteners to be on the outside. This is apparently a better design because if the collar is on the outside, one can see whether the nut is in place. If not in place, there would be a hole where the bolt should be, as the bolt

would fall out from the bottom. Plaintiff and Alton & Southern both asserted that Monsanto was liable, at least in part, for plaintiff's injuries. Both claimed that the huck bolt and fastener in the BR sill step of the MONX 14078 were installed incorrectly. They asserted that the head of the huck bolt should have been downward and the fastener should have been on top. Had the sill step been installed in this manner, any failure of the huck fastener would have resulted in the bolt dropping out, leaving a visible hole. Plaintiff and Alton & Southern claimed that since installation was done in the opposite direction, part of the huck fastener was left in place thereby concealing the problem upon inspection in violation of AAR Rule 96, which provides in pertinent part:

"Rule 96—Owners Responsibility
　A.　At Any Time

* * *

3. Damage or defects on any car not caused by or designated as unfair usage in these rules.

4. Damage or loss of interior or concealed parts."

Monsanto filed a motion *in limine* to the effect that AAR Rule 96 was intended only for the purpose of billing an owner for repairs and not for the purpose of establishing an owner's liability for personal injuries. This motion was denied by the trial court. Plaintiff and Alton & Southern were then allowed to argue that the huck fastener must have been defective as originally installed. Several witnesses testified that if a huck fastener is properly installed, it will stay fastened.

Monsanto's inspector, Clinton Marsh, was not required to inspect each car individually, but was to make sure the cars were constructed properly. Marsh's last trip to Texas to inspect the 14000 tank car series occurred prior to the completion of the rail car in question. Upon completion of the MONX 14078, Trinity issued a certificate of construction which certified that that particular car was built in compliance with all AAR requirements, DOT requirements, and Railroad Safety Appliance Act standards. Robert Stuart, rail and intermodal equipment section manager for Monsanto, testified that when a car is received by Monsanto, it is inspected and the inspection is recorded. This inspection occurs before the car is loaded and placed into interchange. Monsanto is further required by law to perform annual rail car inspections of its fleet and keep records of these annual inspections. Monsanto performed the requisite annual inspections on the MONX 14078 in 1983 and 1984. In addition to these three inspections, two pretrip inspections were performed by Monsanto on the MONX 14078 in 1985, one on January 15, and one on February 22. The in-

spection reports for those dates note no defects in the sill steps. Between February 22 and April 12, 1985, the MONX 14078 was stored at the Terminal Railroad Association yard at Monsanto's request. On April 12, 1985, Monsanto released the MONX 14078 into interchange for transportation to Purex via the Terminal Railroad Association. No pretrip inspection was performed on that date.

At trial, the evidence showed that at the time of plaintiff's injury one end of the BR sill step was not secured with a huck bolt and fastener, but rather had a new, shiny, threaded bolt hanging loosely without a nut. The bolt, absent the connecting nut, could not hold the sill step under plaintiff's weight. Evidence was also introduced that on April 17, 1985, a repair on the BR sill step of the MONX 14078 had been undertaken, but not by Monsanto. A bill to Monsanto charging it for a bolt 12 inches long or less for the sill step was introduced; however, the trial court denied the request to have the name of the business that repaired the sill step introduced into evidence. The Cotton Belt actually performed this repair, but because it had not been third-partied into this lawsuit, the trial court denied Monsanto's request to inform the jury of the name of the company which performed the repair. The trial court also denied Monsanto's request to admit the evidence deposition of Ronald K. Haynes, who performed the April 17, 1985, repair for the Cotton Belt. The basis for this denial was also Monsanto's failure to join the Cotton Belt as a party to the lawsuit.

Alton & Southern received the MONX 14078 on June 9, 1985. According to Jim Miller, superintendent of safety and claims for Alton & Southern, an inbound inspection was performed on the MONX 14078 upon receipt by Alton & Southern on June 9. An inbound inspection consists of a visual examination in which obvious signs of stress or distress are to be reported. No problems with the BR sill step were observed by Alton & Southern until plaintiff fell from it on the following day.

A review of the procedural history of this case is necessary for an understanding of several issues raised by defendants. Plaintiff first filed suit against Missouri Pacific Railroad Company on July 29, 1985. On October 9, 1985, plaintiff was granted leave to file an amended complaint and did so, joining the Alton & Southern as a defendant. On December 10, 1985, plaintiff was again granted leave to amend and filed a second amended complaint, omitting Missouri Pacific, but joining Monsanto. On March 12, 1986, plaintiff was granted leave to file a third amended complaint. Plaintiff's third amended complaint charged Monsanto with negligence in the following three ways:

"(A) Negligently and carelessly failed to inspect the steps on its rail car.

(B) Negligently and carelessly failed to adequately maintain the steps on its railroad car.

(C) Negligently and carelessly failed to warn of the condition of the steps on its railroad car."

On November 24, 1986, Alton & Southern filed its counterclaim against Monsanto alleging Monsanto was negligent in the following ways:

"a. Failed to inspect the steps on its railroad cars prior to releasing said car into interstate commerce on April 15, 1985 in that a nut was missing off of a bolt securing the sill steps on MONX 14078;

b. Failed to adequately maintain the sill steps on MONX 14078 in that it did not replace a nut on the bolt on the sill steps on said car before releasing it into interstate commerce on April 15, 1985;

c. Failed to warn of the condition of the steps on MONX 14078 in that a nut was missing on a bolt on the sill steps on MONX 14078 before releasing it into interstate commerce on April 15, 1985;

d. Failed to have adequate procedures to ensure that MONX 14078 complied with Federal Department of Transportation regulations and requirements concerning the sill steps on said car before releasing it to interstate commerce on April 15, 1985;

e. Failed to repair the sill steps on MONX 14078 while said car was in its possession from March 8, 1985 to April 15, 1985 even though it knew, or should have known, that prior repairs were made to the sill steps on said car on January 10, 1985;

f. Failed to verify the sufficiency of repairs made to MONX 14078 on April 17, 1985 and subsequently failed to warn users of said car of the unsafe condition of the car and sill steps."

The parties participated in discovery which led to the filing of amended pleadings. On August 12, 1988, Alton & Southern filed an amended counterclaim alleging that Monsanto was negligent in one or more of the following ways:

"a. Failed to comply with the provisions of the Code of Federal Regulations, Title 49, Part 231, Railroad Safety Appliance Standards, and more specifically, Section 231.1(d)(4)(ii) in that the 'BR' sill step of Monsanto car MONX 14078 was not securely fastened with not less than a half-inch bolt with nuts

outside and riveted over or with not less than half-inch rivets when Monsanto knew or should have known that said car was being offered for interchange service by Monsanto;

   b. Failed to require compliance on car MONX 14078 with all applicable Department of Transportation and American Association of Railroad Requirements, including Specifications, Regulations, Rules of Interchange and the Department of Transportation Railroad Safety Appliance Standards for the proper securement of sill steps;

   c. Failed to inspect and repair car MONX 14078 for compliance with the Certificate of Construction when it knew or should have known that said car was not in compliance in regard to its sill step securement;

   d. Failed to warn the anticipated users of car MONX 14078 that said unit did not comply with the applicable D.O.T. and A.A.R. requirements for sill steps when it knew or should have known of said condition;

   e. Failed to have adequate procedures for car inspection to insure that MONX 14078 complied with the regulations of the A.A.R. Interchange Rules and requirements concerning the sill step on MONX 14078 before releasing said car into interstate commerce;

   f. Offered car MONX 14078 for interchange when said car contained a missing part which constituted a concealed defect not caused by unfair usage in violation of A.A.R. Interchange Rule 96."

On August 15, 1988, plaintiff filed his fourth amended complaint alleging that Monsanto was negligent in one or more of the following ways:

   "A) Negligently and carelessly caused or allowed to be constructed a railroad tank car which failed to conform with 49 CFR 213.1(4), in that the sill step on the BR end was not securely fastened with bolts which had nuts on the outside.

   B) Negligently and carelessly offered for interchange a railroad tank car which failed to conform with 49 CFR 231.1(4) in that the sill step on the BR end was not securely fastened with bolts which had nuts on the outside.

   C) Negligently and carelessly offered for interchange a railroad tank car which failed to conform with AAR Interchange Rule 96 in that it contained a defect not caused by unfair usage in that the sill step on the BR end was not securely fastened with bolts which had nuts on the outside.

D) Negligently and carelessly offered for interchange a railroad tank car which failed to conform with AAR Interchange Rule 96, in that it contained a concealed part—the sill step on the BR end was not securely fastened with bolts which had nuts on the outside.

E) Negligently and carelessly failed to inspect the sill step on the BR end of its tank car and determine it was not securely fastened with bolts which had nuts on the outside.

F) Negligently and carelessly failed to warn users, including plaintiff, that the sill step on the BR end of its tank car was not securely fastened with bolts which had nuts on the outside.

G) Negligently and carelessly failed to properly repair the sill step on the BR end of its tank car such that it was securely fastened with bolts which had nuts on the outside."

Monsanto objected to both the amended counterclaim filed by Alton & Southern and the fourth amended complaint filed by plaintiff. Monsanto also moved for a continuance on the first day of trial stating that it had been surprised by the presentation of new theories alleged against it in the amended pleadings. Monsanto further moved for leave to add a new expert. The trial court denied both motions made by Monsanto and allowed Alton & Southern to amend its pleadings. Monsanto was granted leave to file a third-party action against the Cotton Belt. This action was severed in order to avoid delay of the principal trial. After the principal trial, however, the trial court reconsidered its decision to grant Monsanto leave to file a third-party complaint against the Cotton Belt. The trial court vacated its order of August 15, 1988, allowing such leave and entered an order striking Monsanto's third-party complaint against the Cotton Belt on the basis of delay.

Alton & Southern was also granted leave to file its third-party complaint against Trinity on August 12, 1988. Due to the late filing of this motion, the cause was severed. On September 27, 1988, Trinity filed a notice of removal of that cause to the United States District Court for the Southern District of Illinois. On December 6, 1988, the district court entered an order remanding the cause back to the circuit court. On January 13, 1989, Monsanto filed a motion seeking leave to file a counterclaim for contribution against Trinity. At the post-trial motion hearing on February 14, 1989, the trial court denied Monsanto leave to file a third-party complaint against Trinity and also dismissed Alton & Southern's third-party complaint against Trinity. Both Monsanto and Alton & Southern have appealed the judgments against them as well as the orders denying them leave to file third-

party complaints. For organizational purposes, we will divide our opinion into five separate areas:

 (1) Alton & Southern v. Trinity;

 (2) Monsanto v. Trinity;

 (3) Monsanto v. Cotton Belt;

 (4) Monsanto v. plaintiff and Alton & Southern; and

 (5) Alton & Southern v. plaintiff.

## I. ALTON & SOUTHERN v. TRINITY

The first issue Alton & Southern asks us to address is whether the trial court erred in vacating its pretrial order granting Alton & Southern leave to file its third-party complaint against Trinity. Alton & Southern contends that it was entitled to file and have heard its third-party complaint against Trinity in order to apportion the liability against another potentially culpable party. Alton & Southern further contends that the only reason it filed so late against Trinity was because Monsanto was dilatory in providing discovery which implicated Trinity. Alton & Southern believes that Monsanto's delay was due to Monsanto's attempt to conceal its own records of the manufacture of the MONX 14078 tank car. Trinity replies that the trial court was correct in vacating its pretrial order granting Alton & Southern leave to file a third-party complaint against Trinity because Trinity was unduly prejudiced by such a late filing. Trinity was not served with notice until three days after the verdict was entered and, therefore, had no opportunity to present a defense on its behalf. Trinity further asserts that a review of the record illustrates that Alton & Southern initially failed to pursue the discovery which would have disclosed the documents that Alton & Southern alleges indicate Trinity's culpability. Finally, Trinity contends that any adverse consequences faced by Alton & Southern as a result of the manner in which both Monsanto and Alton & Southern conducted discovery are not in any way the fault of Trinity, and Trinity should not be punished for their actions. We agree.

Section 5 of "An Act in relation to Contribution Among Joint Tortfeasors" provides:

> "§5. Enforcement. A cause of action for contribution among joint tortfeasors may be asserted by a separate action before or after payment, by counterclaim or by third-party complaint in a pending action." (Ill. Rev. Stat. 1987, ch. 70, par. 305.)

This language has been construed to mean that when there is a pending action initiated by an injured party, contribution claims should be asserted by a counterclaim or by a third-party claim in that action. *Ti-*

*soncik v. Szczepankiewicz* (1983), 113 Ill. App. 3d 240, 245, 446 N.E.2d 1271, 1276.

■■ Our supreme court has held that a party's contribution claim is barred unless it is asserted in that same action. (*Laue v. Leifheit* (1984), 105 Ill. 2d 191, 473 N.E.2d 939.) The *Leifheit* court pointed out strong public policy reasons for such an approach:

> "One jury should decide both the liability to the plaintiff and the percentages of liability among the defendants, so as to avoid a multiplicity of lawsuits in an already crowded court system and the possibility of inconsistent verdicts. Requiring the parties to litigate the matter in one suit will also save court time and attorney fees." (105 Ill. 2d at 196-97, 473 N.E.2d at 942.)

The instant case is distinguishable from *Leifheit*, however, because Alton & Southern did file its contribution claim against Trinity prior to the case proceeding to trial, albeit only three days before trial. We find another case previously decided by this court to be analogous to the instant case.

In *Long v. Friesland* (1988), 178 Ill. App. 3d 42, 532 N.E.2d 914, we found that the trial court abused its discretion in allowing the defendants to file a counterclaim for contribution against a passenger in the plaintiff's vehicle on the sixth day of trial. We found such an abuse of discretion even though the passenger was fully aware of the litigation by having previously been a plaintiff in the lawsuit. The trial court entered judgment against the passenger as plaintiff and for the defendants when it was advised of the existence of a release executed by the passenger. In *Long* we found that the defendants were aware of the facts giving rise to the counterclaim at least three years before trial, but had failed to file a counterclaim. We could see no reason why the discovery of the release would prompt the defendants to file a counterclaim for contribution and excuse their failure to do so earlier. (178 Ill. App. 3d at 60, 532 N.E.2d at 925.) We further found:

> "[The passenger] was denied the opportunity to participate as a defendant in discovery. She was denied representation as a counterdefendant throughout the presentation of plaintiff Long's case. She was unable to attempt to minimize the extent of plaintiff Long's injuries or reduce the amount of damages awarded to Long and she was unable to emphasize Long's negligence to the exclusion of her own." (178 Ill. App. 3d at 60, 532 N.E.2d at 926.)

We find similar prejudice in the instant case. Trinity had no opportunity to prepare and present a defense in a case of which it was not

even made aware until three days after a verdict was entered. The record reveals that Alton & Southern did not file its third-party complaint against Trinity until August 2, 1988, and that Trinity was not served with this complaint and summons until August 25, 1988.

Furthermore, we are unpersuaded by Alton & Southern's argument that it was totally the fault of Monsanto that Alton & Southern filed its contribution claim against Trinity at such a late date and that Alton & Southern should not be penalized for Monsanto's dilatory discovery practices. As pointed out by Trinity in its brief, Alton & Southern originally filed its answer in this action on October 21, 1985. Monsanto filed its responsive pleading in the instant case on March 13, 1986. At any time thereafter, Alton & Southern was free to file discovery directed at Monsanto. (107 Ill. 2d R. 201(b)(1).) Alton & Southern first served interrogatories on Monsanto concerning the MONX 14078 on July 28, 1986. At that time, Alton & Southern did not request the specific documents that led to the discovery that Clinton Marsh had directed Trinity to make changes in the placement of huck fasteners. Alton & Southern admits that it did not forward to Monsanto its request for production of the MONX 14078 car file and other records relating to the tank car until February 16, 1988. Monsanto did not file its notice of compliance until May 31, 1988; however, Alton & Southern did not make a motion to compel compliance. Alton & Southern then blames its delay on the fact that Clinton Marsh was not subject to the subpoena power of the Illinois court, and thus, further delays occurred when Alton & Southern was required to apply for a Missouri subpoena to depose Marsh.

■ We are likewise unpersuaded by Alton & Southern's argument that the trial court could have severed the claim against Trinity by Alton & Southern and thereby protected Trinity. Severance of Alton & Southern's claim against Trinity from the main action could not have cured the prejudice to Trinity, as Trinity would have been bound by the damage award made by the jury to plaintiff. (See *Long v. Friesland* (1988), 178 Ill. App. 3d 42, 60, 532 N.E.2d 914, 926.) Therefore, we find that the trial court did not err in vacating its pretrial order granting Alton & Southern leave to file its third-party complaint against Trinity.

## II. MONSANTO v. TRINITY

Monsanto also raises the issue whether the trial court erred when it refused leave for Monsanto to file a contribution claim against Trinity. However, unlike Alton & Southern, which filed before trial, Monsanto failed to file its motion for leave to file a counterclaim

against Trinity until February 2, 1989. On February 14, 1989, the trial court denied Monsanto's motion. Monsanto generally concedes that this was a late filing under *Laue v. Leifheit*, but argues that if Alton & Southern is allowed to maintain its claim against Trinity, so, too, should Monsanto be allowed. Because we found that the trial court did not err in denying Alton & Southern leave to file a third-party complaint against Trinity, we need not address this issue.

### III. MONSANTO v. THE COTTON BELT

Monsanto also contends that the trial court erred in reconsidering and revoking its order granting leave for Monsanto to file its third-party complaint against the Cotton Belt and in entering an order striking Monsanto's third-party complaint against the Cotton Belt.

After plaintiff and Alton & Southern had been given leave to amend their pleadings, Monsanto was given leave to file a third-party action against Cotton Belt on the first day of trial. Monsanto simultaneously moved to sever the third-party complaint. There was no opposition to these motions, as the Cotton Belt was not represented at trial. On September 1, 1988, 13 days after judgment, the Cotton Belt was served. The Cotton Belt filed a motion to vacate the order which granted Monsanto leave to file the third-party complaint. A hearing was held on the Cotton Belt's motion to vacate on February 14, 1989. On February 17, 1989, the trial court entered a written order striking Monsanto's third-party complaint based on *Long v. Friesland* (1988), 178 Ill. App. 3d 42, 532 N.E.2d 914. Monsanto argues that *Laue v. Leifheit* (1984), 105 Ill. 2d 191, 473 N.E.2d 939, establishes the standard for filing a contribution claim which Monsanto meets. *Long* focuses on whether there is a reasonable explanation for the timing of the filing. Monsanto argues that it did have a reasonable explanation for filing on the day of trial in that plaintiff and Alton & Southern filed amendments which changed the theories of liability against Monsanto. Until this time, Monsanto did not choose to file against the Cotton Belt, but because these new theories focused on Monsanto's alleged negligence at a much earlier date, upon acceptance of the MONX 14078 from the manufacturer, Monsanto now believed it had to file against the Cotton Belt. The Cotton Belt replies that the trial court did not abuse its discretion in denying Monsanto's leave to file a third-party complaint because Monsanto offered no reasonable explanation for waiting until the first day of trial to do so. Monsanto was well aware of a potential contribution claim against the Cotton Belt, but chose not to file. Therefore, the Cotton Belt contends that the contribution claim is barred under *Laue v. Leifheit*. We agree.

Our supreme court has held that when a pending action exists, a defendant's contribution claim is barred unless it is asserted in that action. (*Laue v. Leifheit* (1984), 105 Ill. 2d 191, 473 N.E.2d 939; see also Ill. Rev. Stat. 1987, ch. 70, par. 305.) In the instant case, Monsanto did file a third-party action against the Cotton Belt, but waited until the day of trial to do so. Monsanto then made a motion to sever, so the contribution claim would not have been part of the same action.

Contrary to Monsanto's assertion that the instant case is factually distinguishable from *Long v. Friesland,* we find that the cases are quite similar. In *Long,* we found that the trial court abused its discretion in allowing the defendants to file a contribution action against a passenger in the plaintiff's vehicle on the sixth day of trial. The passenger had been a plaintiff until the trial court entered judgment against the passenger after learning of the existence of a release in defendant's favor executed by the passenger. In *Long,* we found that the defendants were aware of the facts giving rise to the counterclaim at least three years before trial, but had failed to file a counterclaim. We could see no reason why the discovery of the release would prompt the defendants to file a counterclaim and excuse their failure to do so earlier. (*Long,* 178 Ill. App. 3d at 60, 532 N.E.2d at 925.) Similarly, in the instant case, we do not see how plaintiff's and Alton & Southern's amendments would prompt Monsanto to file or excuse Monsanto's failure to file a third-party action against the Cotton Belt at an earlier date.

Monsanto claims that the new theories focused on Monsanto's alleged negligence at a much earlier date—when Monsanto first accepted the car from Trinity. We can see how this might affect Monsanto's position as against Trinity. However, the Cotton Belt's repair of the MONX 14078 occurred on April 17, 1985, only two months prior to plaintiff's accident. In our estimation, the original theories of negligence against Monsanto would be more likely to prompt Monsanto to file a third-party complaint against the Cotton Belt; we cannot agree that the amendments would prompt such a change in trial tactics.

The appropriate time for Monsanto to bring in the Cotton Belt would have been within the time given to Monsanto to file its answer. Failing to bring in the Cotton Belt within this time meant that in order to do so, Monsanto had to secure leave of the trial court. (Ill. Rev. Stat. 1987, ch. 110, par. 2—406(b).) The question of allowing a third-party complaint not filed within time for filing an answer is left to the trial court's discretion. (*Hastings v. Abernathy Taxi Associa-*

*tion, Inc.* (1973), 16 Ill. App. 3d 671, 675-76, 306 N.E.2d 498, 502.) Allowing Monsanto to file its third-party complaint at this late date would certainly have delayed the trial. As previously pointed out in the Alton & Southern v. Trinity portion of this opinion, severance would not have cured the prejudice to the Cotton Belt (see *Long v. Friesland*, 178 Ill. App. 3d at 60, 532 N.E.2d at 926), especially in light of the fact that Monsanto did not cross-examine plaintiff's doctors, did not cross-examine plaintiff's economist, and did not put on any evidence contesting plaintiff's injuries. Therefore, we find that the trial court did not abuse its discretion in reconsidering and revoking its order granting leave for Monsanto to file its third-party complaint against the Cotton Belt and in entering an order striking Monsanto's third-party complaint against the Cotton Belt.

### IV. ALTON & SOUTHERN v. PLAINTIFF

The first issue Alton & Southern asks us to address is whether plaintiff's use of a chart during closing argument illustrating the amount of damages he was seeking which included the word "MUST" was proper or whether it constituted reversible error. Monsanto also raises this same issue. Both defendants contend that the use of this chart was improper and prejudicial because it contained the word "MUST" in bright, boldly printed letters, which, they assert, gave the improper illusion that the amounts listed on the chart were mandatory rather than suggestive. Defendants further contend that the jury was thoroughly confused by this chart as evidenced by a note sent by the jury to the trial court during deliberations, which asked:

"Can we adjust any of the amounts for damages?

(1) disability and disfigurement (2) future pain and suffering (3) future lost wages."

Defendants contend that the court's response to this question, that the jurors must look to the previously given instructions to find the answer, did not cure the confusion, and that the jury's award of damages was but a "mirror image" of plaintiff's chart.

Plaintiff responds that the sums listed on the chart were presented as suggestions, not as formulae that had to be followed. Plaintiff contends that use of the word "must" reflected nothing more than what the jury would be instructed by the court. For example, once the jury determined that liability had been established, the jury "must *** compensate [plaintiff] for any of the following elements of damages proved." (Illinois Pattern Jury Instructions, Civil, No. 30.01 (2d ed. 1971) (hereinafter IPI Civil 2d).) Plaintiff argues that he placed the word "MUST" on the chart only because once evidence of

each of these damages was presented, the law states that the jury "MUST" compensate plaintiff for those elements. Plaintiff argues that his closing argument time and again reminded the jury that they would decide whether the elements had been proven. As to the note sent out by the jury, plaintiff contends that assuming, *arguendo*, that the note demonstrated some confusion, the confusion was not caused by the chart because the jury only asked about three elements of damages, not about every element listed on the chart. Finally, plaintiff points out that the jury did adjust the award on the chart by actually awarding more money for future lost wages than was listed on the chart. Therefore, plaintiff contends that the jury was not under the impression that the awards listed on the charts were mandatory.

Use of a demonstrative chart by plaintiff's counsel in closing argument whereon sums are written next to each element of damage claimed has been held proper. (*Caley v. Manicke* (1962), 24 Ill. 2d 390, 394, 182 N.E.2d 206, 209; *Barreto v. City of Waukegan* (1985), 133 Ill. App. 3d 119, 134, 478 N.E.2d 581, 592.) Problems generally arise with the use of such charts where the sums reflect a mathematical formula for pain and suffering rather than a mere suggestion of a sum. (See *Caley*, 24 Ill. 2d at 394, 182 N.E.2d at 209, as compared to *Warp v. Whitmore* (1970), 123 Ill. App. 2d 157, 164, 260 N.E.2d 45, 49.) In the instant case, there was not a *per diem* problem with the chart. Plaintiff's attorney did not arrive at the amounts written on the chart by a *per diem* calculation.

The chart in question lists the elements of damages as provided in the jury instructions with a blank space next to each element. During closing argument, plaintiff's attorney filled in the blanks with amounts which he believed would adequately compensate plaintiff. For the most part, the jury awarded these sums, except the jury raised the amount suggested by plaintiff's counsel on the chart for future lost wages from $650,000 to $713,483. A review of that portion of the transcript concerning defense counsel's closing arguments clearly indicates that both Monsanto and Alton & Southern failed to make any other suggestions in terms of dollar amounts which would adequately compensate plaintiff, and, in fact, failed to argue the issue of damages. For example, counsel for Alton & Southern stated during his closing:

> "The amount of money that you folks ultimately decide to return for Mr. Grimming in this case is going to be your decision. It is going to be for you to decide based upon the evidence. Mr. Keefe will ask you for an amount of money I am sure. I am not going to suggest an amount of money to you because you folks

know what presumably—have some feel for what might be fair compensation in this case and it is something for you folks as reasonable jurors to decide."

Plaintiff's counsel also discussed the fact that it was the jury's duty to decide the amount of damages that would adequately compensate plaintiff:

"And one thing that they said which I completely agree with as it relates to damages is you do have to decide. And folks, I am going to tell you something. Only thing I can tell you is that I'm glad it's you that has to decide it and not me."

Plaintiff's counsel went on to state:

"He is entitled, I believe. Maybe it's more. I don't know. Maybe it's less. But folks, I don't think it's less than this. And I think this amount for disability and disfigurement, $1.5 million. This amount for past pain and future pain and suffering, $1.5 million. And these numbers for his wage loss."

From these comments, it is clear that the jury was told that it was for them to decide what amounts would adequately compensate plaintiff.

■ We believe that the word "MUST" written on the chart was properly explained by plaintiff. "MUST" indicated that if defendants were found liable for plaintiff's injuries, a point conceded by Alton & Southern, then the jury must adequately compensate plaintiff for the five elements of damages listed on the chart. We believe that the court's response to the note sent from the jury was proper, and the record reflects that neither attorney for defendants objected to the response. Further, we agree with plaintiff that the jury's award of $713,483, rather than the $650,000 provided in the chart for future pain and suffering, refutes any argument that the jury felt it was obligated to award the amounts listed on the chart. For all these reasons, we cannot say that the jury did not independently evaluate plaintiff's damages. We find, therefore, that the chart used by plaintiff's attorneys during closing argument was proper.

The next issue Alton & Southern asks us to address is whether the trial court erred in giving plaintiff's instruction No. 23, a non-IPI jury instruction concerning plaintiff's right to recover for aggravation of a preexisting condition. The instruction in question read as follows:

"Plaintiff's right to recover damages for his injuries and disability is not barred or to be limited in any way by the fact, if you find it to be a fact, that the plaintiff's injuries and disability resulted from an aggravation of the preexisting condition by the occurrence in question, nor by reason that the plaintiff be-

cause of a preexisting physical condition was more susceptible to injury than other persons might have been."

Evidence concerning plaintiff's injuries was presented at trial. The evidence reflected that the incident in question was not the first time plaintiff suffered back injuries. In 1976, plaintiff suffered a back injury for which a disc was removed. In 1982, plaintiff was laid off from his job as a switchman for Alton & Southern. Thereafter, plaintiff went to work as a warehouseman at Scott Air Force Base. In 1983, while employed as a warehouseman, plaintiff suffered injuries to his back when a truck driver threw a box of jelly to plaintiff. Plaintiff immediately felt pain in his back after catching the box. Dr. Michael Murphy treated plaintiff for this injury. Dr. Murphy suspected a herniated disc and referred plaintiff to a neurologist for a myelogram which disclosed a herniated L5-S1 disc on the left side for which plaintiff underwent chemondeolysis. After treatment, plaintiff returned back to light duty at the base, but two weeks later, on September 7, 1983, while taking a lunch break, a leg on the chair on which plaintiff was sitting broke and caused plaintiff to fall on his back. On September 13, 1983, plaintiff went back to Dr. Murphy for treatment. On January 20, 1984, another myelogram disclosed a herniated L4-5 disc. Dr. Murphy performed a posterior lumbar interbody fusion with bone graft on January 23, 1984. Plaintiff was called back to work as a switchman for Alton & Southern in the fall of 1984. On September 20, 1984, Dr. Murphy approved plaintiff's return to work for Alton & Southern. On September 24, 1984, Dr. Mark Lichtenfeld performed a fitness-for-duty examination on plaintiff at the request of Alton & Southern. Dr. Lichtenfeld determined that plaintiff was able to return to full duty. Plaintiff remained under Dr. Murphy's care and was seen on March 26, 1985. Plaintiff was next seen by Dr. Murphy on June 11, 1985, one day after the incident in question. A myelogram and CAT scan showed probable pressure on the L5-S1 nerve root. Plaintiff underwent a lumbar fusion at L5-S1. Dr. Murphy testified that plaintiff's three back operations were all in the same area. Dr. Murphy further testified that, except for new complaints of pain, plaintiff's symptoms were essentially the same after the June 10, 1985, accident as they had been before. He also noted that plaintiff's surgeries prior to June 10, 1985, could result in degenerative changes to the lumbar spine. With this evidence before them, with obviously more detail than we have recounted, the jury was charged.

Over Alton & Southern's objection, the court gave plaintiff's instruction No. 23, heretofore recited. It is Alton & Southern's contention that plaintiff's instruction No. 23 was argumentative and con-

trary to the law in that it contained adversarial statements which directed the jury to award damages for plaintiff's preexisting condition and not the aggravation thereof. We disagree.

This same instruction has been previously considered by other Illinois courts. In *Balestri v. Terminal Freight Co-op Association* (1979), 76 Ill. 2d 451, 394 N.E.2d 391, our supreme court determined that the only instruction given regarding the aggravation of a preexisting condition, IPI Civil 2d No. 30.03, a general instruction advising the jury to compensate plaintiff for, among other things, "the aggravation of any pre-existing condition," did not adequately instruct the jury on the issue of aggravation of a preexisting condition. Thus, the supreme court found that the trial court had erred in refusing to give the instruction complained of in the instant case. The *Balestri* court noted in *dicta* that one might contend that the instruction was argumentative, but since that was not the basis of the refusal of the instruction, the basis of refusal being that it was non-IPI, the trial court had erred in summarily refusing to give it. (76 Ill. 2d at 456, 394 N.E.2d at 393.) Two dissents in *Balestri*, however, focused on the argumentative nature of the instruction and stated that the case should not be reversed based upon the trial court's decision not to give what the dissenters believed was an erroneous instruction. See 76 Ill. 2d at 456-63, 394 N.E.2d at 393-97 (Underwood and Ryan, JJ., dissenting).

In *Lay v. Knapp* (1981), 93 Ill. App. 3d 855, 417 N.E.2d 1099, decided after *Balestri*, the Third District Appellate Court examined the same instruction and found that the giving of this instruction was warranted to amplify the IPI instruction concerning the aggravation of a preexisting condition (IPI Civil 2d No. 30.03). (93 Ill. App. 3d at 858, 417 N.E.2d at 1101.) The *Lay* court found that the instruction did not advance adversarial overtones nor attempt to highlight facts in evidence which supported the plaintiff's position. (93 Ill. App. 3d at 858-59, 417 N.E.2d at 1102.) Likewise, we find that the instruction in the instant case is similar in tone. We also note that since this case went to trial, a new Illinois Pattern Jury Instruction has been added which deals directly with the issue of the aggravation of a preexisting condition. The new IPI Civil No. 30.21, approved for publication on October 15, 1988, provides:

"If you decide for the plaintiff on the question of liability, you may not deny or limit the plaintiff's right to damages resulting from this occurrence because any injury resulted from *** [an aggravation of a pre-existing condition] [or] [a pre-existing condition which rendered the plaintiff more susceptible to injury]." (Illinois Pattern Jury Instructions, Civil, No. 30.21 (3d ed. 1990).)

The notes indicate that "This instruction should be given whenever IPI 30.03 is given." IPI Civil 2d No. 30.03 was given in the instant case without objection.

■ We believe that the introduction of this new IPI instruction, similar to plaintiff's No. 23 herein, lends credence to our decision that the trial court committed no error in giving plaintiff's No. 23. We are unpersuaded by Alton & Southern's argument that plaintiff's No. 23 directed the jury to compensate plaintiff for his preexisting condition. Rather, we find that the instruction correctly stated the law in Illinois that a tortfeasor is liable for the injuries he causes, even though the injuries consist of the aggravation of a preexisting condition. *Chicago City Ry. Co. v. Saxby* (1904), 213 Ill. 274, 72 N.E. 755.

The final issue Alton & Southern asks us to address is whether the trial court erred in allowing into evidence a statement by Dr. Mark Lichtenfeld concerning plaintiff's work expectancy prior to the instant injury. Alton & Southern contends that the trial court erred in denying its objection to testimony by Dr. Lichtenfeld which was presented to the jury in the form of an evidence deposition. In cross-examination by counsel for Alton & Southern, the following colloquy took place:

"Q. And as part of the physical examination on 9-26-84, you weren't asked to form any opinions about his work life expectancy, were you?

A. I had no reason to believe that there would be any limitation in his work expectancy whatsoever. At the time of that examination, I fully expected him to have a normal, full complete working life to age 65 or whatever.

Q. Doctor, my question is this and I will repeat it for you. Were you asked as a part of your examination to determine Mr. Grimming's work life expectancy?

A. No."

Alton & Southern's attorney then moved to strike the original answer as nonresponsive. At trial, the objection was argued and denied by the court. In its brief, Alton & Southern has attacked the ruling on other grounds, but since they were not included in the objection at trial, they will not be considered here. *Littlefield v. Alton & Southern R.R.* (1968), 96 Ill. App. 2d 470, 478-79, 239 N.E.2d 147, 151.

■ We do agree with Alton & Southern that Dr. Lichtenfeld's answer was not responsive to the question asked, but we find it to be harmless error. (See *Sutton v. Penn* (1925), 238 Ill. App. 182, 184.) Dr. Lichtenfeld was hired on September 26, 1984, by Alton & Southern to conduct a fitness-for-duty examination on plaintiff that had nothing whatsoever to do with the instant lawsuit. As pointed out by plaintiff in

his brief, Dr. Lichtenfeld made several references during direct examination that prior to June 10, 1985, plaintiff had completely recovered from his previous back injuries and would be able to return to his full duties at Alton & Southern without any limitations. In addition, Dr. Murphy also testified that he believed that plaintiff had sufficiently recovered so as to allow him to go back to his job as a switchman for Alton & Southern. After examining the record in detail as to this matter, we find no basis for reversal.

### V. MONSANTO v. PLAINTIFF AND ALTON & SOUTHERN

Monsanto's first argument is that it was entitled to a directed verdict or a judgment notwithstanding the verdict (*j.n.o.v.*) against plaintiff because a faulty repair of the sill step by the Cotton Belt was the sole proximate cause of plaintiff's injuries. Monsanto asserts that the trial court failed to admit all relevant evidence regarding the repair by the Cotton Belt and further erred by failing to properly instruct the jury on the issue of proximate cause. Monsanto makes an interesting and lengthy argument concerning its theory of the case. Its basic premise is that even though it may have put the MONX 14078 into interchange with an improperly constructed sill step, it is not liable for any injuries to plaintiff, as the Cotton Belt made a faulty repair on the BR sill step by installing a bolt with the head upward and the nut downward without peening the bolt. This faulty repair constitutes an independent, intervening cause of plaintiff's injuries and, thus, breaks any causal connection between the condition of the car prior to the repair and plaintiff's injuries.

In *Robertson v. General Tire & Rubber Co.* (1984), 123 Ill. App. 3d 11, 462 N.E.2d 706, we found that it is not a proper defense that a nonparty to the litigation is liable for negligence. In *Robertson*, the plaintiff brought a wrongful death action against the defendant, a tire manufacturer, to recover for the death of her husband, who was killed while attempting to replace lug bolts on a wheel when the wheel rim violently separated. The defendant tire manufacturer filed an affirmative defense claiming that it was the negligence of the decedent's employer that was the sole proximate cause or a contributing proximate cause of the decedent's death. We held that the trial court was correct to sustain the plaintiff's motion to strike the manufacturer's affirmative defense that the plaintiff's employer was the sole proximate cause or a contributing cause. In reaching the *Robertson* decision, we noted that the result was not unfair to the defendant since a third-party action was available as a recourse. Applying *Robertson* to the case at bar, we find that the trial court properly excluded evidence and argument concerning

Cotton Belt's repair of the sill step in April 1985. Monsanto had the opportunity to file a third-party action against the Cotton Belt, but chose not to do so until the morning of trial.

■ The standard of review in deciding whether a directed verdict or a *j.n.o.v.* was proper is indeed rigorous. Directed verdicts and *j.n.o.v.*'s are proper only in those cases in which all of the evidence when viewed in its aspect most favorable to the opponent so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 509-10, 229 N.E.2d 504, 513.) *Pedrick* emphasizes that the parties have a right to have substantial factual disputes resolved by the jury. Applying the *Pedrick* standard to the instant case, we hold that Monsanto was not entitled to a directed verdict or a *j.n.o.v.*

In addition, in the instant case Monsanto was allowed to introduce evidence that supported its theory of the case. Specifically, there was evidence that at the time of plaintiff's accident, there was "a shiny new bolt" on the BR sill step which was unlike the original equipment. Moreover, Monsanto did show that it did not have possession of the MONX 14078 after February 1985. Monsanto introduced evidence that a repair was done on the BR sill step in April 1985 by someone other than Monsanto for which Monsanto was billed. Monsanto was also able to show that the reason the nut fell off was because the person who did the repair did not "peen" the bolt. However, plaintiff's evidence and Alton & Southern's evidence established that even though Monsanto had contracted to build the MONX 14078 to DOT- and AAR-approved specifications, the sill steps on the MONX 14078 did not comply. The design drawings of the MONX 14078 show that the sill steps are to be fastened with huck bolts having the "collar" on top, but plaintiff's exhibit No. 10, a photograph of the BR sill step, shows that the bolt head rather than the collar is on top, the opposite of what the design drawings specify and the opposite of 49 C.F.R., Part 231. Moreover, there was evidence that Monsanto inspected the MONX 14078 upon completion and before it was placed into interchange, but failed to detect any problem with the BR sill step. Annual inspections were also done by Monsanto in 1983 and 1984 without detection of the sill step problem. Monsanto also failed to detect the problem on two pretrip inspections performed in 1985. There was, therefore, sufficient evidence to hold Monsanto liable under a theory of failure to inspect or adequately maintain the MONX 14078.

Monsanto also contends that the trial court erred by not allowing the deposition of Robert Haynes, the employee of the Cotton Belt who performed the April 17, 1985, repair, into evidence. Monsanto contends that had it been introduced, it would have negated plaintiff's argument

that Monsanto did not comply with the AAR rules. In his deposition, Haynes stated that he did not know about the AAR rules requiring repairs to conform to the original construction and that he always installed the bolts in the sill steps with the bolt head up and the nut down, that he never peened sill step bolts, and, finally, that the huck bolt was discovered missing from its hole and not dangling loosely. Again, we find that Monsanto's own trial tactics led the trial court to deny this evidence. Had Monsanto timely filed a contribution action against the Cotton Belt, all this evidence could have been allowed. Instead, Monsanto's last-minute filing of a contribution action led the trial court to exclude the deposition of Haynes.

Finally, Monsanto argues that the trial court erred in not giving IPI Civil 2d No. 12.04 in its entirety. It reads:

"More than one person may be to blame for causing an injury. If you decide that the defendants were negligent and that their negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant." (Illinois Pattern Jury Instructions, Civil, No. 12.04 (2d ed. 1971).)

The trial court gave an instruction based on the first paragraph of No. 12.04 and omitted the second paragraph. Monsanto argues that the second paragraph should have been given because evidence was presented showing that the Cotton Belt was the sole proximate cause of plaintiff's injuries. We disagree.

The notes to IPI Civil 2d No. 12.04 specifically state that "[t]he second paragraph should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was the conduct of a third person." (Illinois Pattern Jury Instructions, Civil, No. 12.04, Notes on Use, at 75 (2d ed. 1971).) Even if we accept, *arguendo*, that Monsanto presented sufficient evidence to show that the Cotton Belt was an intervening cause, thereby discharging Monsanto of its duty to plaintiff, there is still the issue of Alton & Southern's liability that must be addressed. Alton & Southern admitted liability to plaintiff for his injuries; therefore, the Cotton Belt by definition cannot be "the sole proximate cause" of plaintiff's injuries. We find that the trial court was correct to reject the instruction as offered by Monsanto, first, because it did not accurately reflect the evidence as adduced in this case and, second, because it would have confused the jury.

The next issue Monsanto asks us to address is whether the trial

court erred by allowing plaintiff and Alton & Southern to amend their complaint and counterclaim, respectively, within days of trial and whether the trial court compounded the error by denying Monsanto's request for a continuance and/or leave to name a new expert to counter these alleged new theories of negligence. According to Monsanto, the fourth amended complaint filed by plaintiff and the amended complaint filed by Alton & Southern presented a new theory of liability unrelated to the original theory. Monsanto claims that these amendments unfairly prejudiced its case because it was not allowed to prepare an adequate defense to meet these new allegations.

It is well settled that the decision whether to allow an amendment to a complaint or counterclaim lies within the sound discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion. *Powers v. Strum* (1973), 12 Ill. App. 3d 346, 350, 297 N.E.2d 628, 631.

In *Lawson v. Hill* (1979), 77 Ill. App. 3d 835, 396 N.E.2d 617, it was explained that a trial court should be liberal in allowing amendments and that the most important question is whether the amendment will be in furtherance of justice. The *Lawson* court went on to explain:

> "[W]hile recognizing that an amendment should not ordinarily be permitted to set up matters of which the pleader had full knowledge at the time of interposing the original pleading and no excuse is presented for not putting its substance in the original pleading, such an amendment will be allowed where justice is not served by denying leave to amend; doubts should be resolved in favor of allowing amendments." 77 Ill. App. 3d at 845, 396 N.E.2d at 625.

In the instant case, both plaintiff and Alton & Southern adequately explained the late filing of the amendments against Monsanto as being due to Monsanto's late discovery responses. The record supports this explanation. The only new issue raised by plaintiff's fourth amended complaint and by Alton & Southern's amended counterclaim was that Monsanto was liable for plaintiff's injuries because the MONX 14078 was improperly constructed and offered for interchange by Monsanto. This evidence first came to light in February 1988, when the depositions of Robert Stuart and Marianne Stanek were taken. These Monsanto employees related to Alton & Southern and plaintiff that there were documents and files in Monsanto's possession regarding the manufacture and subsequent repairs of this tank car. Alton & Southern had originally asked for such information on July 28, 1986, in its interrogatories and request for production which it served on Monsanto. Monsanto did not comply with this request. After the depositions of Stanek and Stuart,

Alton & Southern made another request for production directed at Monsanto on February 17, 1988, which stated:

"[P]roduce within 28 days the complete Certificate of Construction file identified in Ms. Stanek's deposition, the complete Monsanto Car File on Car MONX 14078 *** all Monsanto documents or records relating to the purchase of said car including the purchase order and any records or other documentation related to Monsanto's input on the design or specification of said car series."

Monsanto finally complied with this request on May 31, 1988. This was apparently the first time Monsanto produced any evidence concerning construction of the car and its condition when offered into interchange. From this file, plaintiff and Alton & Southern learned that the huck fasteners on the BR end of the sill step had been applied upside down, opposite to Monsanto's own drawings. The file also named Clinton Marsh as the inspector who had been hired by Monsanto to inspect the 14000 series of cars before they were offered into interchange.

On June 13, 1988, a pretrial conference was held. Monsanto was notified of this setting but failed to appear. At that time, the court specially set this case for trial on August 15, 1988, and stated that no further continuances would be allowed. The case had been continued on five previous occasions. The trial court's June 13, 1988, order also stated that all witnesses must be disclosed by June 24, 1988. On June 14, 1988, Alton & Southern disclosed several witnesses, including Stephen Lauver and James Heselton. On August 2, 1988, plaintiff and Alton & Southern asked Clinton Marsh about their theory that the original construction of the huck fastener was improper. Clinton Marsh did not agree that the direction of the huck fastener presented any problem in the original construction of the railway car. However, Lauver, an employee of Union Pacific Railroad and a voting member of the AAR Tank Car Committee, provided a basis for such a theory during his deposition on August 10, 1988. Plaintiff and Alton & Southern then made amendments to their pleadings on August 12, 1988, and August 15, 1988, respectively.

■■■ Allowing these amendments was within the discretion of the trial court. Had Monsanto disclosed its complete file on the MONX when originally requested, there would not have been the need for these final amendments.

Monsanto next argues that, because both plaintiff and Alton & Southern changed their theories of the case on the eve of trial, it was entitled to a continuance. Monsanto also contends that a continuance was merited in order to give Monsanto the time to name a new expert

to counter the testimony of Lauver, whose deposition was not taken until six days before trial. Monsanto originally argued that Lauver's testimony was in violation of Supreme Court Rule 220 (107 Ill. 2d R. 220), which requires an expert to be disclosed 60 days before trial. However, in its reply brief, Monsanto concedes that the trial court did not commit error by failing to bar the testimony of Lauver as that argument was never made by Monsanto at trial. Monsanto instead relies on its argument that the trial court erred by failing to grant a continuance and by failing to allow opposing expert testimony to contradict Lauver.

██ █ It is axiomatic that litigants do not have an absolute right to a continuance. Instead, the decision to grant or to deny a motion for continuance lies within the sound discretion of the trial court. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1007; *Bean v. Norfolk & Western Ry. Co.* (1980), 84 Ill. App. 3d 395, 405 N.E.2d 418.) The decision of the trial court will not be disturbed on appeal unless it has resulted in a palpable injustice or constitutes a manifest abuse of discretion. (*Wine v. Bauerfreund* (1987), 155 Ill. App. 3d 19, 22, 507 N.E.2d 155, 156.) Section 2—1007 of the Code of Civil Procedure states, in pertinent part:

> "The circumstances, terms and conditions under which continuances may be granted, the time and manner in which application therefor shall be made, and the effect thereof, shall be according to rules." Ill. Rev. Stat. 1987, ch. 110, par. 2—1007.

Supreme Court Rule 231(f) states:

> "(f) Time for Motion. No motion for the continuance of a cause made after the cause has been reached for trial shall be heard, unless a sufficient excuse is shown for the delay." (107 Ill. 2d R. 231(f).)

Overall, Supreme Court Rule 231 requires that a movant show due diligence in obtaining material evidence as well as the facts which constitute the evidence. *Trillet v. Bachman* (1981), 96 Ill. App. 3d 477, 421 N.E.2d 580.

██ The instant case was originally filed against Monsanto on December 10, 1985. The cause was set for trial five previous times and continued at the request of Monsanto one of these times. Finally, on June 13, 1988, a pretrial conference took place. Monsanto was notified of this conference, but failed to appear. The trial court issued an order scheduling final disclosure of witnesses for June 24, 1988, specially setting the trial for August 15, 1988, and providing for no further continuances. In addition to Monsanto's failure to appear, Monsanto also failed to disclose its complete file on the MONX 14078 when originally requested. As previously discussed, this late disclosure was the reason for the amended pleadings. By allowing Monsanto a continuance on the day

of trial, this case would have been postponed yet another time without Monsanto showing due diligence. We do not believe the trial court abused its discretion in concluding there was not sufficient excuse shown to justify the requested continuance. Likewise, we do not believe the trial court erred in denying Monsanto's request for leave to name a new expert on the morning of trial. This, too, would have required a continuance. Also, after reviewing the record, we find that there was sufficient evidence to counter Lauver's testimony concerning violation of rules for construction of the sill step. The best testimony to contradict Lauver's testimony came from Clinton Marsh, Monsanto's inspector on the 14000 series of cars. He testified that he did not believe it mattered which way the huck fasteners were inserted. Monsanto's attorney engaged in the following colloquy with Marsh:

"Q. If you had been at the plant at the time [MONX] 14078 was built and if you had seen a huck fastener on the sill step inserted from the top rather than from the bottom, what would have been your reaction?

A. I would have no concern.

Q. Why?

A. It doesn't make any difference. There is no requirement as to which way the huck pins—there is no AAR requirement as to which way the huck pin is turned. And it has the same retaining ability regardless of which way it's turned."

On redirect examination Marsh stated his opinion that even if the huck fastener would fail in a situation where the fastener was inserted from the top down that the pin could possibly stay in the hole. We must also point out that Lauver was Alton & Southern's expert, not plaintiff's expert. Plaintiff had rested his case by the time Lauver's testimony was introduced. We do not believe that Monsanto was so prejudiced by this testimony that a reversal is warranted. The record indicates that the new theory of liability merely presents evidence that should have been disclosed by Monsanto much earlier in the history of this lawsuit. We are unpersuaded that Monsanto was surprised by the amendments made to the pleadings. Additionally, we find that the trial court was within its discretion to deny Monsanto's request for continuance.

The next issue raised by Monsanto is whether the trial court erred in admitting AAR Rule 96 as evidence against Monsanto and in utilizing this rule to instruct the jury. Monsanto contends that Rule 96 simply allocates financial responsibility between railroads for the cost of repair of cars, and the rule was not intended to and does not create a standard of care. A review of the language of the AAR rules is necessary for a complete understanding of this issue.

The preface to the AAR Interchange Rules specifically states:

> "These rules are formulated \*\*\* with the intent of: (a) making car owners responsible for and, therefore chargeable with the repairs to their cars necessitated by ordinary wear and tear in fair service, Safety Requirements and by the Standards of the Association of American Railroads."

The rule specifically objected to by Monsanto states:

> "Rule 96—Owners Responsibility
> A. At Any Time
>
> \* \* \*
>
> 3. Damage or defects on any car not caused by or designated as unfair usage in these rules.
> 4. Damage or loss of interior or concealed parts."

Monsanto filed a motion *in limine* to exclude introduction of AAR Rule 96 on the first day of trial. This motion was denied. Portions of the rule were introduced into evidence. Additionally, employees of Monsanto testified that Monsanto is a signatory of the rules. Finally, instructions based upon this rule were given to the jury. In our estimation, the preface clearly indicates that the AAR rules not only assign the economic costs of making repairs to rail cars to the owners, but also make the owners "responsible" for such repairs. Rule 96, therefore, makes owners responsible for damage and defects on rail cars not caused by unfair usage and also makes the owners responsible for damage or loss of concealed parts.

■■ ■ "Evidence of standards, safety rules, regulations, and codes are admissible to aid the finder of fact in deciding the standard of care in negligence actions." (M. Graham, Cleary & Graham, Handbook of Illinois Evidence, §406.5 (5th ed. 1990).) In *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93, our supreme court extended the rule that a violation of a statute or ordinance that is designed to protect human life is *prima facie* evidence of negligence provided they are validly adopted and have the force of law. (64 Ill. 2d at 390, 356 N.E.2d at 97.) The supreme court found support for its position in the case of *Darling v. Charleston Community Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, wherein the supreme court permitted the admission into evidence of hospital regulations adopted by the State Department of Public Health. The *Davis* court, citing *Darling*, stated:

> " 'This evidence aided the jury in deciding what was feasible and what the defendant knew or should have known. It did not conclusively determine the standard of care and the jury was not instructed that it did.' [33 Ill. 2d at 332, 211 N.E.2d at 257.] Either of the tendered instructions here could well have aided the jury in

deciding what plaintiff should have known and done. Likewise, the instructions did not conclusively determine the standard of care, for they provided that if the jury found a violation they could 'consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party was contributorily negligent.' " (64 Ill. 2d at 391, 356 N.E.2d at 98.)

Likewise, in the instant case, we find that the introduction of AAR Rule 96 and instructions based on the rule were beneficial in that they aided this jury in determining the standard of care Monsanto owed to plaintiff. Monsanto's own employees testified that Monsanto had agreed to be bound by these rules, which imposed obligations upon car owners after the car is offered for interchange. However, violation of this rule did not constitute negligence *per se*. Monsanto was still able to introduce evidence and argue that it acted reasonably under the circumstances, despite any violation of AAR Rule 96. See *Davis v. Marathon Oil*, 64 Ill. 2d at 390, 356 N.E.2d at 97.

■■ Finally, contrary to Monsanto's assertion, we do not find our interpretation of AAR Rule 96 inconsistent with the interpretation of the AAR rules found in *Toledo, Peoria & Western R.R. v. Burlington Northern, Inc.* (1978), 67 Ill. App. 3d 928, 385 N.E.2d 937, and *Pierce v. Burlington Northern R.R. Co.* (C.D. Ill. 1987), 684 F. Supp. 997. We note that the *Pierce* court was considering the applicability of these rules at the motion stage, while the trial court in this case had the benefit of testimony from two of Monsanto's employees on this point. First, Mr. Robert Stuart, Monsanto's manager of the rail and intermodal equipment section, testified as follows:

"Q. [By Mr. Keefe]: My question to you at this point is, Mr. Stuart, there is a preface which is contained in the Field Manual of Interchange rules, is that correct?

A. Correct.

\* \* \*

Q. [By Mr. Keefe]: The preface, sir, which I have had marked as Plaintiff's Exhibit No. 3 \*\*\* indicates, does it not, number one, 'These rules are formulated in two manuals designated Field Manual and Office Manual as a guide to the fair and proper handling of all matters contained therein for interchange of freight traffic with the intent of:' and then we come to number (a), first one. And it makes reference to car owners, does it not, sir?

A. Yes.

Q. And it makes reference to car owners and their responsibility and therefore chargeable with the repairs to their cars ne-

cessitated by ordinary wear and tear in fair service. And then it said, 'Safety Requirements and by the standards of the Association of American Railroads,' is that correct?

A. That's what it says.

Q. And you understand, don't you, from the preface of the AAR Interchange Rules that you already indicated you are a signator, which means you signed on them, right, or your company has—you understand that car owners by the very language of the preface under the Field Manual which you have in your hand are given some responsibilities as it relates to safety requirements and as it relates to the standards of the Association of American Railroads, isn't that right, sir?

A. That's the way I read it, too."

Second, Dan Middleton, distribution superintendent of Monsanto's Krummrich plant, whose duties included overseeing the people who perform actual inspections, originally testified that the rule dealt only with charges for work done, but under further questioning disclosed the following:

"Q. [By Mr. Keefe]: Manual does say things about owners' responsibility, too, doesn't it?

A. Yes, owners' responsibility for the charges associated with the repairs.

Q. Does it say something about—isn't there a rule that relates specifically to owners' responsibility in the Field Manual?

A. You are going to have to—I will have to look at the preface of the book or rather the index and go through it and specifically pick it out.

Q. Perhaps that would help you.

A. Okay, Rule 96, Owners' Responsibility.

Q. Okay. And with reference to MONX 14078, that's Monsanto's car. They are the owner. So, obviously, they have some responsibility concerning that car, don't they?

A. Correct.

Q. And the rule talks about owners' responsibility, doesn't it, sir?

A. That's the title. It's Rule 96.

Q. Rule 96, Owners' Responsibility. And right below that, what are the words? It says A.

A. 'At any time.'

Q. At any time. How do you interpret the words 'At any time,' sir?

A. All the time.

Q. Then what does number one say?

A. 'Missing material not otherwise designated in these rules.'

Q. All right. And what does number three say?

A. 'Damage or defects on any car caused by or designated as unfair usage in these rules.'

Q. For the record, doesn't it say not caused by?

A. Yes. 'Damage or defects on any car not caused by or designated as unfair usage in these rules.'

Q. And what does number four say?

A. Damage or loss of interior or concealed parts.

Q. Okay. So with reference to the Interchange rules which you have indicated have relevance to you, Monsanto, as a car owner, as it relates to safety requirements, you have responsibility as it relates to safety requirements addressing such issues as missing material or damage or defects that haven't been caused by or designated as unfair usage or damage or loss of interior or concealed parts?

A. Right."

Even though Stuart and Middleton both agreed that Rule 96 made Monsanto somewhat responsible for safety requirements on its rail cars, we agree with the *Pierce* court that the AAR rules are not the definitive word on the allocation of responsibility between railroads who use each other's railroad equipment. (684 F. Supp. at 999.) Introduction of AAR Rule 96 in the instant case was but one piece of evidence the jury could consider in determining the standard of care Monsanto owed to plaintiff.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

RARICK and CHAPMAN, JJ., concur.