SHERI LYNN BANKS, Indiv. and as Adm'r of the Estate of Jeffrey Lynn Banks, for the Benefit of Sheri Lynn Banks, *et al.*, Plaintiff-Appellant, v. RAMON CLIMACO, Defendant-Appellee.

Fifth District    No. 5—95—0868

Opinion filed September 5, 1996.

Stephen R. Kaufmann, of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, and Ian Christopherson, of Christopherson Law Offices, of Las Vegas, Nevada, for appellant.

Charlene A. Cremeens and Brad G. Pelc, both of Cremeens & Associates, of Belleville, for appellee.

PRESIDING JUSTICE HOPKINS delivered the opinion of the court:

Plaintiff, Sheri Lynn Banks, appeals from the jury's verdict in favor of defendant, Ramon Climaco, M.D., in this medical malpractice case. Sheri, who is the widow of Jeffrey Lynn Banks, appeals on her own behalf and in behalf of Brooke Shelby Banks, Jeffrey's daughter. Jeffrey died on October 28, 1991, at the emergency room (ER) of St. Anthony's Memorial Hospital (St. Anthony's) in Effingham, Illinois. Dr. Climaco was the attending physician on call when Jeffrey arrived at the ER at approximately 9:35 p.m. on October 27, 1991.

Plaintiff filed her multiple-count complaint alleging medical mal-

practice by defendants Climaco and Ashokkumar Shah, the anesthesiologist on duty the night of Jeffrey's death. St. Anthony's and nurse anesthetist James Kinney were named as respondents in discovery, until they settled with plaintiff some months before the trial. Dr. Shah settled with plaintiff at the close of all of the evidence. Hence, during its deliberations the jury considered only the liability of Dr. Climaco.

On appeal, Sheri argues (1) that the trial court committed reversible error by allowing evidence, argument, and a jury instruction to the effect that the sole proximate cause of Jeffrey's death was someone other than defendant Climaco; (2) that the trial court erred in failing to grant her motion for mistrial, which motion was based upon a newspaper disclosure of the pretrial settlement of St. Anthony's; and (3) that the court erred in failing to grant her motion for a directed verdict or for a judgment notwithstanding the verdict. For reasons we will more fully explain, we affirm.

## I. FACTS

### A. NEWSPAPER DISCLOSURE OF PRETRIAL SETTLEMENT

Prior to the opening statements of the attorneys, the trial judge told the 12 regular jurors and the two alternates that they should avoid all media accounts of the trial and, in particular, that they should avoid reading local newspapers and listening to the local radio stations during the trial. At the end of the first day of the trial the jurors were admonished again to "avoid all media contacts."

On the second day of trial, plaintiff's attorney moved for a mistrial, on the basis of the following quote on the front page in the previous day's afternoon edition of the local newspaper:

> "In the original lawsuit filed Jan. 11, 1994, several area doctors along with St. Anthony's Memorial Hospital were named as respondents in discovery in the lawsuit over the 1991 death of Jeffrey Banks. Subsequent motions in the case involve a settlement made with the hospital, according to Charlene A. Cremeens, attorney for one of the defendants. All others named as respondents in discovery *** have been dismissed, according to Cremeens."

Plaintiff's attorney argued that his case had been irreparably prejudiced by the newspaper article, that the court should order a mistrial immediately, since the jury had only heard one day of testimony, and that he did not want to proceed with the trial, which was expected to take a full two weeks. Plaintiff's attorney argued that in order to make a record after the trial was over, he would have to "go out and basically interview the jurors and get affidavits and file a motion and get the thing set up for appeal." The trial court

denied the motion for mistrial, after individually interviewing all 12 regular jurors and the two alternates. None of the jurors had read the newspaper article, except one of the regular jurors, who was removed from the panel and replaced with one of the alternates.

## B. EVIDENCE PRESENTED AT THE JURY TRIAL

Jeffrey arrived at the ER with a self-inflicted stab wound to the abdomen. At the ER, Dr. Climaco ordered a continuation of the fluid therapy started by the ambulance staff and assessed his vital signs. Jeffrey's blood-alcohol content was assessed at .22, his breathing was labored, his blood pressure was within the normal range, and his heart rate was abnormally high.

The respiratory therapist on duty that night, Jeffrey Pietrzyk, continued the respiratory assistance given by the ambulance staff, which was to assist Jeffrey's breathing with an "ambu bag." According to all accounts of the medical personnel at the ER, Jeffrey was combative when he arrived at the ER and during most of his time there. As a result of his combativeness and since the knife was secured in his abdomen prior to surgery, Jeffrey's limbs were restrained during his entire time in the ER.

Climaco determined that Jeffrey required surgery to remove the knife from his abdomen, a decision which none of the experts who testified at trial criticized. However, no surgeon was available as soon as needed, so Climaco ordered Jeffrey transferred to Carle Clinic in Champaign, Illinois, where the surgery was to be done. Prior to transfer, Climaco decided to intubate Jeffrey. When a patient is intubated, a respiratory tube is place in the patient's mouth and into his trachea, so that he can be artificially respirated. Climaco's attempt to intubate Jeffrey at approximately 10 p.m. was unsuccessful. As a result, Climaco called for an anesthesiologist to perform the intubation. At approximately 10:30 p.m., a nurse anesthetist, James Kinney, came in and also unsuccessfully tried to intubate Jeffrey. Starting at 10:30 p.m., Dr. Climaco ordered that Jeffrey be given Valium to sedate him.

When Shah, the anesthesiologist, arrived at 11:07 p.m., he talked briefly with his nurse anesthetist and then ordered succinylcholine, a drug that temporarily paralyzes a patient, including his ability to breathe on his own, in order to accomplish the intubation. Before Jeffrey was given the succinylcholine, he was preoxygenated, *i.e.*, he was given additional oxygen to avoid problems with the period during which he could not breathe, which occurs before the endotracheal tube is in place and working properly. Shah placed the endotracheal tube in Jeffrey's throat, and Pietrzyk listened for Jeffrey's breath

sounds. Pietrzyk testified that when he did not hear the proper breath sounds, he told Shah that the tube was in the wrong place, in the esophagus instead of the trachea. Pietrzyk testified that Shah insisted that the tube was in the right place.

Pietrzyk continued to assist Jeffrey's breathing with the ambu bag but still could not hear any breath sounds, so again, he told Shah that the tube was in the wrong place. At the same time, Pietrzyk noticed that Jeffrey's stomach was becoming noticeably distended, which is a sign of an improper esophageal intubation, as the air is entering the stomach rather than the lungs. According to Pietrzyk, Shah did not respond to him, so Pietrzyk again suggested that Shah should check the placement of the tube, at which time Shah walked out of the room. Shortly after Shah left, according to Pietrzyk's account, Jeffrey's heart rate went down to 30 to 40 beats per minute, which is dangerously low. Pietrzyk then called for a "code," which is done when the hospital personnel determine that the patient will die if not given immediate assistance. Pietrzyk testified that the nurse anesthetist then listened for the breath sounds and, hearing nothing, took out the improperly placed tube and correctly reintubated Jeffrey. Pietrzyk estimated that about five to six minutes elapsed before the second tube was properly placed. Jeffrey was given cardiopulmonary resuscitation, but he never revived.

Both Climaco and Shah testified. In addition to the factual summary we have just set forth, Climaco testified that he was also treating other patients in the ER on October 27, 1991, and that he was in and out of Jeffrey's room at least five times that evening. Climaco's initial treatment of Jeffrey was to give fluids intravenously, since he assumed that Jeffrey had "massive bleeding" due to the stab wound. Climaco testified that at approximately 10 p.m., the volume of the IV fluids was decreased, as Jeffrey's vital signs had stabilized by that time. Climaco testified that he never listened for rales or other problematic lung sounds after 10 p.m. and that he never considered pulmonary edema as a possible diagnosis. Climaco was not present when Shah was intubating Jeffrey. He came back into the room after the code was called.

Shah's testimony directly conflicts with that of Pietrzyk, the respiratory therapist. In particular, Shah remembered only one instance in which Pietrzyk said that he could not hear any breath sounds. Shah testified that when Pietrzyk said that he could not hear any breath sounds, Shah listened for breath sounds himself and realized that Pietrzyk was right. Shah's nurse anesthetist then immediately corrected the tube placement. Shah estimated that only 1 to 1¹/₂ minutes elapsed between the first intubation and the second.

When Shah administered the succinylcholine and performed the first intubation, he had not talked to Climaco, had not checked Jeffrey's ER records, did not know how much fluid Jeffrey had been given, had not inquired whether the ER had certain oxygen monitoring equipment available to use, and did not know the level of oxygen in Jeffrey's blood. Shah admitted that succinylcholine can cause a person's heart rate to become dangerously slow and that if given to an impaired patient, the decreased heart rate can end in cardiac arrest.

Shah testified that he was present when Jeffrey's heart rate went down to 30 or 40 and that he responded by administering atropine to increase the heart rate. The heart monitor used on Jeffrey indicates that his heart rate increased to 73 briefly after the atropine was given. Shah admitted that he left the ER when Jeffrey's heart rate came back up, even though he knew that the effect of atropine wears off very quickly and even though he felt it was his duty to stay with the patient until he was stable and out of danger. Shah admitted that he did not check to see if Jeffrey's stomach was distended before he left and that he was already gone when the code was called.

The testimony of James Kinney, the nurse anesthetist, was essentially the same as that given by Shah, except Kinney estimated that the amount of time between the improper and the successful intubations may have been about five minutes, but he stated that he really did not know how long it took. According to Kinney, Shah was present through the second intubation and remained until Jeffrey was stable and was making feeble attempts to return to normal breathing. A few minutes after Shah left, before the code was called, Kinney also left.

## C. EXPERT TESTIMONY

Plaintiff called four expert witnesses. First, Dr. John Heidingsfelder, a forensic pathologist, testified that Jeffrey died of pulmonary edema, or fluid accumulation in the lungs. According to Heidingsfelder, at the time of the intubation, Jeffrey went into heart failure due to the huge amount of fluid in his lungs. Heidingsfelder did not attribute Jeffrey's death to Shah's improper esophageal intubation. Specifically, Heidingsfelder testified that even if the esophageal intubation lasted from five to six minutes, he believed that Jeffrey died from fluid overload and pulmonary edema.

Second, James Matthews, M.D., testified that Climaco deviated from the accepted standard of care applicable to an ER doctor in Effingham, Illinois, in two ways: (1) he gave too much fluid to Jeffrey, and (2) he should have been present during the intubation. Matthews testified that various test results showed that Jeffrey was not bleed-

ing internally and, therefore, did not need the large volume of fluid given. Additionally, considering the high level of alcohol and Valium in Jeffrey's system, he should have been sedated. Since Jeffrey was combative, Matthews felt that the agitation was probably due to fluid overload, which can adversely affect respiration, especially when the patient is lying flat on his back, as was Jeffrey. According to Matthews, the cause of Jeffrey's death was a combination of hypoxia, or a low level of oxygen in the bloodstream, which was brought on by the fluid overload, and the esophageal intubation.

Third, in the opinion of Dr. Graham, a forensic pathologist, Mr. Bank's death was caused by the failure of his brain to get enough oxygen when the intubation tube was placed into his esophagus instead of his trachea.

The fourth expert to testify for plaintiff was Dr. Leon Ampel, an anesthesiologist, who testified that Jeffrey's death was caused by a combination of the fluid overload, which was Climaco's responsibility and which forced Jeffrey into pulmonary edema, and Shah's improper esophageal intubation. Ampel specifically testified that at the time of Shah's intubation, Jeffrey was not on the verge of death due to the fluid overload, but for the amount of the fluid he was given, he was improperly monitored.

Climaco called Daniel Sullivan, M.D., an ER doctor, as his expert witness. The trial court instructed the jury that Sullivan was called as an expert witness by Climaco to testify regarding Dr. Climaco's treatment and that his testimony was not to be considered as it related to any deviation of the standard of care by Shah. Sullivan testified that, in his opinion, Jeffrey's death was caused by a cardiac arrest due to either the succinylcholine or the esophageal intubation. In Sullivan's opinion, the fluids given by Climaco prior to 11:10 p.m., when the code was called, did not cause or contribute to Jeffrey's death. Finally, the treatment provided by Climaco did not violate the applicable standard of care.

## D. JURY INSTRUCTIONS

The trial court read the following instruction to the jury after Shah's testimony and subsequent settlement and before the closing arguments:

"THE COURT: Members of the jury, A. Shah, M.D., is no longer a party to this action. You should not concern yourselves with this fact nor speculate regarding the reasons for this. The fact that A. Shah, M.D., is no longer a party to this action should not affect your consideration of damages, if any, to be awarded to plaintiff if you find from the evidence that the remaining defendant, Ramon Climaco, M.D., is liable to the plaintiff in accordance with the court's instructions."

During a conference with the trial court, out of the hearing of the jury, plaintiff's attorney renewed his motion *in limine* to bar any evidence or argument concerning any nonparty, which at that time included Shah, since he had settled with plaintiff. Climaco's attorney objected, stating that it "would be clearly inappropriate to preclude me from now talking about the testimony that this jury has heard" about Shah's alleged negligence. Climaco's attorney stated that his affirmative defenses "go to sole proximate cause, so to preclude me from commenting upon the testimony that this jury has heard I think would be clearly improper." The trial court denied plaintiff's motion to bar evidence and argument regarding nonparties.

Additionally, the court denied plaintiff's motion that the jury should be given only the first paragraph of Illinois Pattern Jury Instructions, Civil, No. 12.05 (3d ed. 1989) (hereinafter IPI Civil 3d No. 12.05). The instruction given to the jury, over plaintiff's objection, is as follows:

> "If you decide that the defendant was negligent and that his negligence was a proximate cause of death to the plaintiff, it is not a defense that something else may also have been a cause of the death.
>
> However, if you decide that the sole proximate cause of death to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant."

The jury was also instructed that plaintiff was claiming that Climaco was "*a* proximate cause of the death of Jeffrey Banks" (emphasis added) and that defendant was asserting "the affirmative defense that *the sole* proximate cause of Jeffrey Banks' death was the conduct of A. Shah, M.D." (emphasis added), and that defendant had the burden of proving his affirmative defense.

The jury returned a verdict in favor of Dr. Climaco. It is from this verdict that plaintiff appeals.

## II. ANALYSIS

### A. SOLE PROXIMÀTE CAUSE

■ The pivotal issue in this case is whether defendant Climaco presented enough evidence to support his sole-proximate-cause affirmative defense and jury instruction. Plaintiff argues that at the time this case went to trial, the applicable law on this issue was stated in two fifth district cases: *Grimming v. Alton & Southern Ry. Co.*, 204 Ill. App. 3d 961 (1990), and *Robertson v. General Tire & Rubber Co.*, 123 Ill. App. 3d 11 (1984). Plaintiff argues that under *Grimming* and *Robertson*, "it is not a proper defense that a non-party to the litigation is liable for negligence and it is improper for the jury to be

instructed that it is a valid defense." *Grimming*, 204 Ill. App. 3d·961; *Robertson*, 123 Ill. App. 3d 11.

Plaintiff is correct that *Grimming* and *Robertson* both hold that a defendant should not be allowed to use an affirmative defense that the sole proximate cause of plaintiff's injury is due to the actions of a nonparty, unless the defendant has availed himself of the remedy of either a counterclaim or third-party action against the nonparty. *Grimming*, 204 Ill. App. 3d at 984-85; *Robertson*, 123 Ill. App. 3d at 16-17. However, neither *Grimming* nor *Robertson* clearly supports plaintiff's argument that the sole-proximate-cause instruction given in the case at bar was improper. Additionally, our supreme court has clearly stated, in *Leonardi v. Loyola University*, 168 Ill. 2d 83 (1995), that even a general denial of liability by a defendant, without an affirmative defense or counterclaim or third-party action, is "sufficient to permit the defendant in support of his position to present evidence that the injury was the result of another cause." *Leonardi*, 168 Ill. 2d at 94.

■ Hence, plaintiff's argument that the trial court erred in denying plaintiff's motion to strike Climaco's affirmative defense, *i.e.*, that Shah was the sole proximate cause of Jeffrey's death, fails. *Leonardi* makes it clear that Climaco had no burden to file a sole-proximate-cause affirmative defense and that he was entitled to present evidence regarding Shah's responsibility for Jeffrey's death, based upon his general denial of liability in his answer. *Leonardi*, 168 Ill. 2d at 93-94. "A defendant has the right not only to rebut evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, but also *** to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries." *Leonardi*, 168 Ill. 2d at 101.

■ Plaintiff argues that *Leonardi* does not apply to the case at bar, as it considered the use of Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1989) (hereinafter IPI Civil 3d No. 12.04), rather than IPI Civil 3d No. 12.05. However, we find that *Leonardi* is instructive and controlling on both the issue of the sole-proximate-cause affirmative defense and the jury instruction. In *Leonardi*, also a medical malpractice case, the plaintiff argued that the jury should be given only the first paragraph of IPI Civil 3d No. 12.04. The second paragraph of IPI Civil 3d No. 12.04, used in *Leonardi*, refers to the "conduct of some person other than the defendant" as the sole proximate cause of plaintiff's injury, whereas the second paragraph of IPI Civil 3d No. 12.05, used in the instant case, refers to "something other than the conduct of the defendant" as the sole proximate cause

of plaintiff's injury. The language of IPI Civil 3d No. 12.05 is more comprehensive than the language of IPI Civil 3d No. 12.04, as "something other than the conduct of the defendant" may include the conduct of a nonparty such as Dr. Shah. That IPI Civil 3d No. 12.05 refers to "something other than the conduct of the defendant," rather than the more specific "conduct of some person other than the defendant" of IPI Civil 3d No. 12.04, is a distinction without meaning as applied to the facts of this case.

We now consider whether the evidence in this case was sufficient to warrant giving the jury the sole-proximate-cause instruction. If the jury was presented some competent evidence tending to support Climaco's theory that Shah was the sole proximate cause of Jeffrey's death, then the instruction was proper. *Leonardi*, 168 Ill. 2d at 101; *French v. City of Springfield*, 5 Ill. App. 3d 368, 374 (1972).

■ ■ The standard for proving negligence in a medical malpractice case is: "[T]he plaintiff, by the use of expert testimony, must establish the standards of care against which the defendant doctor's conduct is measured. The plaintiff must further prove by affirmative evidence that, judged in the light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff." *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 423 (1975). Clearly, where a defendant seeks to prove that someone or something other than he is the sole proximate cause of plaintiff's injury or death, the standard enunciated in *Borowski* applies equally to that defendant as to the plaintiff. In order to prevail on that point and in order to be entitled to the second paragraph of IPI Civil 3d No. 12.05, the defendant must produce evidence that the sole proximate cause of the plaintiff's injury was something other than the defendant's conduct. In the case at bar, Dr. Graham testified that, in his opinion, to a reasonable degree of medical certainty, Jeffrey's death was the result of the esophageal intubation performed by Shah. Thus, the jury heard expert testimony, which, if believed, supported Climaco's theory that Shah was responsible for Jeffrey's death, and the instruction was properly given.

Moreover, the ultimate test for determining the propriety of any jury instruction is whether all of the instructions, when read as a whole, fairly, fully, and comprehensively informed the jury of the relevant principles of law (*Leonardi*, 168 Ill. 2d at 100) without misleading or confusing the jury. *McCall v. Chicago Board of Education*, 228 Ill. App. 3d 803, 810 (1992). Here, plaintiff does not argue that the sole-proximate-cause instruction was confusing or misleading, and from our review of the record, we find that the jury was fairly, fully, and comprehensively instructed as to the relevant principles of law.

As such, the trial court did not abuse its discretion in allowing the jury to be instructed as to the second paragraph of IPI Civil 3d No. 12.05.

## B. MOTION FOR MISTRIAL

■ Plaintiff argues that the trial court erred in denying her motion for mistrial, which was based upon the account of the pretrial settlement of St. Anthony's in the local newspaper on the first day of trial. Plaintiff's argument fails.

> "A mistrial should be declared only as the result of some occurrence of such character and magnitude that a party is deprived of its right to a fair trial, and the moving party must demonstrate actual prejudice as a result of the ruling or occurrence. [Citation.] The trial court's ruling on a motion for mistrial will not be disturbed upon appellate review absent a clear abuse of discretion." *Baker v. CSX Transportation, Inc.*, 221 Ill. App. 3d 121, 138 (1991).

There is nothing in the record to indicate any pretrial order prohibiting any of the attorneys from talking to the press about the settlement with the hospital or any other aspect of the case. In oral arguments before this court, plaintiff's attorney indicated that all of the parties agreed before the trial, in a pretrial hearing, that the settlement with the hospital would not be raised in any way before the jury. However, there are no transcripts of any pretrial proceedings in the record on appeal, and there is no written order or docket entry in this record to support plaintiff's contention.

In conclusion on this point, although we certainly do not approve of defense counsel's discussion of the settlement with the press, we conclude that the trial court's denial of the motion for a mistrial was not an abuse of discretion.

## C. MOTION FOR DIRECTED VERDICT

■ Plaintiff argues that the trial court erred in denying her motion for directed verdict and her motion for a judgment notwithstanding the verdict, since the evidence established that the negligence of Dr. Climaco was a proximate cause of Jeffrey's death and the evidence did not support any conclusion that Shah's conduct was the sole proximate cause of Jeffrey's death. The law is settled that a verdict should be directed and a judgment notwithstanding the verdict should be entered only in those cases in which all of the evidence, when viewed in the light most favorable to the opponent of the motions, " 'so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Johnson v. National Super Markets, Inc.*, 257 Ill. App. 3d 1011, 1014 (1994), quot-

ing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967).

It is clear in this case that the jury could reasonably conclude, based upon the evidence, that Shah was the sole proximate cause of Jeffrey's death and that Climaco's conduct did not proximately cause Jeffrey's death. When viewed in the light most favorable to Climaco, the evidence, which we have previously set forth at some length, supports the jury's verdict. Moreover, the jury was presented with highly conflicting testimony by occurrence witnesses and differing opinions by expert witnesses. It was the jury's province to resolve these differences by deciding which testimony to believe and which to reject. The trial court did not abuse its discretion in denying plaintiff's motions for directed verdict and for judgment notwithstanding the verdict. See *Maple v. Gustafson*, 151 Ill. 2d 445 (1992).

## III. CONCLUSION

For all of the reasons stated, we affirm the judgment of the trial court.

Affirmed.

CHAPMAN and MAAG, JJ., concur.