KENNETH W. COCHRUM, Plaintiff-Appellant, v. OLD BEN COAL COMPANY, Defendant-Appellee.

Fifth District    No. 5—96—0040

Opinion filed April 4, 1997.

A. Courtney Cox, of Hart & Hart, of Benton, for appellant.

Ronald J. Lipinski and Yvette Caizzi, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellee.

JUSTICE MAAG delivered the opinion of the court:

The plaintiff, Kenneth W. Cochrum, filed this action against the defendant, Old Ben Coal Company, his employer, seeking damages for defendant's refusal to recall him in a suitable capacity and its alleged threat to discharge him due to plaintiff's exercise of his rights under the Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 1992)). The trial court directed a verdict in favor of defendant at the close of plaintiff's case. Plaintiff filed a timely notice of appeal.

We note from the outset that plaintiff's attorney conceded in oral argument that he was only seeking compensatory damages for approximately one week. More specifically, plaintiff agreed that he was seeking compensatory damages from April 29, 1993, the date that plaintiff attempted to return to work as a roof bolter within Dr.

James Wilkinson's restrictions, and May 10, 1993, the date that the United Mine Workers went on strike. Plaintiff also sought punitive damages.

The relevant facts are as follows. The plaintiff was employed as a union coal miner by the defendant from July of 1978 until he was laid off in December of 1993. Plaintiff worked underground at Mine 25 as a roof bolter. A roof bolter drills the overhead roof of the coal mine and installs permanent roof supports after a mining machine makes a cut and removes the coal from the opening. More specifically, the roof bolter places the roof bolting machine into the center of a place that has been mined out. The roof bolter must "pry" any rock or coal that might be loose with a pry bar to ensure that the roof is solid. The pry bar is solid steel and ranges in length between four to eight feet, and the heavier ones weigh about 13 to 15 pounds. A hydraulic machine is used to drill, in a specific pattern, holes in the roof of the coal mine. The roof bolter on the left places two bolts on the left, and the roof bolter on the right places two bolts on the right. The roof bolts measure from five feet up to eight feet. After drilling the hole, the roof bolter inserts a tube of glue or epoxy resin into the hole. The bolt is then inserted into the hole until the glue sets up, and pressure is maintained against the top for a few seconds. The roof bolting machine contains a material tray. When the material tray is empty, the materials are then sent back up by a scoop, and the roof bolter removes the materials from the scoop and places them on the roof bolter. The bolts generally come in bundles of five, and the roof bolters carry the bundles from the scoop to the material tray. If a roof bolter is installing eight-foot bolts and they are in a position where the ceiling is lower than eight feet, the bolt must be bent so it can be placed into the hole. The roof bolter then straightens the bolt up when the top of the bolt is placed into the hole. Additionally, a roof bolter's ancillary responsibilities include lifting materials, loading the machine, moving water lines, keeping dust down, and in general, maintaining the section.

On December 21, 1991, plaintiff injured his shoulder while he was reloading supplies on the roof bolting machine. Plaintiff was initially treated by Dr. Richard Fox and Dr. Richard Morgan. Dr. Morgan referred plaintiff to Dr. Wilkinson. Dr. Wilkinson had previously treated plaintiff's shoulder in 1988 when a large rock fell and hit his shoulder. The defendant requested that plaintiff be examined by Dr. Richard Lehman also. On March 18, 1992, Dr. Lehman examined plaintiff's shoulder and determined that he would be able to return to work on March 23, 1992, with no restrictions. At that time, plaintiff was still under Dr. Wilkinson's care. Dr. Wilkinson

had not given the plaintiff a release to return to work. Plaintiff received a letter from Old Republic Insurance Company, dated March 19, 1992, advising him that his temporary total disability benefits would be terminated on March 23, 1992. On that date, plaintiff started receiving sickness and accident benefits. Plaintiff then had arthroscopic surgery in late April 1992. On May 28, 1992, Dr. Wilkinson released the plaintiff to return to work without any restrictions.

Plaintiff testified that when he returned to work on May 28, 1992, his shoulder was "extremely weak" and "tight." When the plaintiff returned to work, he told the assistant mine manager, Marvin Webb, that he was under "financial duress" and that was the reason that he had returned to work. He claimed that he also told Mr. Webb that his shoulder was "extremely sore" and "weak." On June 1, 1992, Mr. Webb instructed the plaintiff to pick up some steel water line. Plaintiff protested, stating that his shoulder was weak and sore. Mr. Webb told the plaintiff that if he could not do his job he should go home and that if he was not 100% he should not come back. Plaintiff picked the water line up and reinjured his shoulder.

Plaintiff called Dr. Wilkinson on June 5, 1992, for pain medication and actually saw him at his office on June 8, 1992. Dr. Wilkinson stated that plaintiff had "full range of motion of the shoulder [and] no instability," and the doctor "did not find any real area of point tenderness."

Plaintiff did not fill out an accident report until June 24, 1992, and continued to work until June 30, 1992. He saw Dr. Wilkinson again on July 2, 1992. Dr. Wilkinson took plaintiff off work from June 30, 1992, to an undetermined time. The plaintiff returned to Dr. Wilkinson on August 5, 1992. At that time, Dr. Wilkinson noted that the plaintiff appeared to be improving while off work and doing the gentle pendulum-type exercises. Dr. Wilkinson recommended that they expand his exercises to general strengthening and that plaintiff should stay off work. Plaintiff returned to Dr. Wilkinson on September 4, 1992. Dr. Wilkinson stated that he had "almost full motion, still lacking some extension, internal rotation." Dr. Wilkinson prepared a therapy program for the plaintiff for shoulder girdle and rotator cuff strengthening and continued to keep him off work.

In October 1992, Dr. Wilkinson recommended that plaintiff get a second opinion from Dr. Thomas Limbird at Vanderbilt University Medical Center. On November 10, 1992, Dr. Limbird issued a report in which he stated: "[Plaintiff] has a full range of motion *** without any impingement signs. He has no crepitation in the shoulder. He has no tenderness at the AC joint. I can produce no tenderness by stressing his shoulder today. His shoulder is quite stable. His strength

is excellent. Today, he has no abnormality of his shoulder, which makes it quite difficult *** to make any recommendations at this point. Certainly, his history is quite good for acromioclavicular disease. I have suggested to him that we start him on some anti-inflammatories and allow him to go back to activity as tolerated." After plaintiff returned to Dr. Wilkinson for a follow-up examination, Dr. Wilkinson recommended to plaintiff that he find another occupation.

On January 6, 1993, defendant sent plaintiff to Dr. Lehman for a second examination. Plaintiff claimed that the examination lasted less than two minutes. Dr. Lehman felt that plaintiff could return to work, but he recommended that plaintiff have a diagnostic bone scan. In early February of 1993, plaintiff had the bone scan. On March 16, 1993, Dr. Lehman released the plaintiff to return to work without any restrictions. Dr. Wilkinson still had not released the plaintiff to return to work. Plaintiff's workers' compensation benefits were terminated at that time, and he began receiving sickness and accident benefits. Plaintiff was then advised to return to work on March 17, 1993.

At that time, plaintiff told Larry Wilson, superintendent of Mine 25, that he did not think that he was ready to return to work. Mr. Wilson informed plaintiff that if he was not able to perform the duties of roof bolter, he needed something from his doctor stating that he was unable to perform his job. On March 26, 1993, plaintiff obtained a statement from Dr. Wilkinson that he had a permanent disability and permanent restrictions of no overhead lifting, no heavy lifting, and no pulling or pushing away from the body. Plaintiff then delivered Dr. Wilkinson's work release to the mine. Dr. Wilkinson stated that the restriction limiting plaintiff's ability to push or pull out from his body means that plaintiff's elbows must remain next to his body.

Plaintiff was then evaluated at the Center for Occupational Enhancement. That report indicated that plaintiff could return to full duty after two to four weeks of work-hardening. On April 9, 1993, plaintiff discussed the aforementioned report with Dr. Wilkinson, and he recommended that plaintiff not participate in the program.

Plaintiff was reevaluated by Dr. Lehman on April 28, 1993. Plaintiff claimed that the examination lasted less than five minutes. Dr. Lehman again released plaintiff to return to work as a roof bolter without any restrictions. Plaintiff's sickness and accident benefits were terminated subsequent to Dr. Lehman's release. When plaintiff returned home from Dr. Lehman's examination, there was a message

on his answering machine ordering him to return to work the next day.

When plaintiff returned to work on April 29, 1993, he presented Mr. Wilson with a restricted work release from Dr. Wilkinson that he had obtained earlier that day stating that the plaintiff had the following permanent restrictions: no overhead work and no heavy lifting or pulling or pushing out from the body. Plaintiff admitted that he could not perform the full duties of a roof bolter within Dr. Wilkinson's restrictions. Plaintiff claimed that Mr. Wilson told him that he had been instructed to accept Dr. Lehman's recommendations and to disregard Dr. Wilkinson's work restrictions. Plaintiff protested that he could not work against his doctor's orders. Mr. Wilson then informed the plaintiff that the defendant would consider any further absences from work as unexcused, and that if he continued to absent himself from work he could be discharged pursuant to article XXII, section (i), paragraph 4, of the National Bituminous Coal Wage Agreement of 1988, the collective bargaining agreement. That article and section states as follows:

"(4) Absences of Two Consecutive Days

When any Employee absents himself from his work for a period of two (2) consecutive days without the consent of the Employer, other than because of proven sickness, he may be discharged ***."

Thus, plaintiff refused to work as a roof bolter without restrictions on April 29, 1993. Plaintiff again refused to work as a roof bolter without restrictions on April 30, 1993, May 1, 1993, and May 3, 1993. Subsequent to the aforementioned absences, plaintiff received a letter from the defendant stating that he was being suspended with intent to discharge for being unexcused on April 29, 1993, April 30, 1993, May 1, 1993, and May 3, 1993. We also note that plaintiff did not request light duty or bid on any other jobs. Plaintiff claimed that he did not do so because he was confident that he could perform his job within Dr. Wilkinson's restrictions. Moreover, it is undisputed that from March 18, 1993, to April 28, 1993, there were no jobs available at Mine 25 that plaintiff could fully perform within the restrictions, and that plaintiff did not submit any bids for jobs at Mine 28 from March 16, 1993, through May 10, 1993.

The plaintiff filed a grievance contesting his suspension. Pursuant to the procedures outlined in the collective bargaining agreement, the dispute went to arbitration. Two meetings between plaintiff's and defendant's representatives were held in order to resolve this controversy. In the first meeting, Dennis Niziolkiewicz, on defendant's behalf, offered to agree on a third doctor to examine the plaintiff and to be bound by the findings of the third doctor.

Plaintiff refused defendant's offer. In the second meeting, defendant once again offered to have plaintiff examined by a mutually agreeable doctor and be bound by that doctor's findings, and plaintiff refused. Defendant agreed that it would not pursue a discharge but would suspend defendant for 60 days. The arbitrator ultimately upheld the suspension and decided that defendant had complied with the requirements under the collective bargaining agreement.

On May 10, 1993, the United Mine Workers at Mine 25 went on strike. The union remained on strike until December 15, 1993. During this time, the plaintiff received strike pay and performed his duties on the picket line. On December 16, 1993, plaintiff and 90 other employees were laid off. It is undisputed that since the layoffs, no employees have been recalled to work, and Mine 25 has been shut down.

Plaintiff filed claims on both of his workers' compensation injuries, and those claims have both been settled. Hence, workers' compensation benefits are not an issue in this case.

In the instant case, the plaintiff claimed that the defendant threatened to discharge him and refused to recall him to work in a suitable capacity because he exercised the rights and remedies granted to him by the Act in violation of section 4(h) of the Act. 820 ILCS 305/4(h) (West 1992). In the trial court, defendant filed a motion for summary judgment asserting that there was no position available that plaintiff could have performed within Dr. Wilkinson's restrictions. The trial court denied defendant's motion for summary judgment, based on the existence of a genuine issue of fact. Following plaintiff's presentation of his case to the jury, defendant moved for a directed verdict. Defendant claimed that plaintiff had failed to produce evidence to establish one of the necessary elements of his case, that is, a causal connection between his workers' compensation claims and defendant's refusal to recall him to active service. Defendant also claimed that there was no evidence that there was an open and available position for which plaintiff was qualified. The trial court granted defendant's motion for a directed verdict on the bases that plaintiff failed to prove that there was other work available that he could have performed and that defendant did not have an obligation to modify the conditions or job description of an employee. The trial court also stated that although it believed that the jury could have found that the defendant was attempting to coerce its employees back to work by sending them to Dr. Lehman, it could not reach that issue because plaintiff failed to prove that there was other work available for him. Plaintiff now claims that the trial court erred in directing a verdict in favor of defendant at the close of plaintiff's case.

■ The Illinois Supreme Court, in *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967), determined that a verdict ought to be granted and judgments notwithstanding the verdict entered only in those cases in which "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." See *Banks v. Climaco*, 283 Ill. App. 3d 842, 853 (1996).

It is clear that plaintiff has no cause of action for retaliatory discharge, because he was laid off with 90 other employees for economic reasons. Plaintiff claims, however, that this action is not for retaliatory discharge, but for retaliatory refusal to recall or rehire.

■ Defendant claims that the Illinois Supreme Court in *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 39 (1994), refused to expand the cause of action for retaliatory discharge to include retaliatory demotion. We agree. Defendant claims, however, that the *Zimmerman* decision holds that "there can be no cause of action for retaliatory conduct without an actual discharge." This statement is not accurate. Although the *Zimmerman* decision did hold that there is no cause of action for retaliatory demotion, it did not discuss, let alone overrule, the cases that recognize a cause of action for retaliatory refusal to recall, which would be "retaliatory conduct without an actual discharge."

Section 4(h) of the Act states as follows:

> "It shall be unlawful for any employer *** to discharge or to threaten to discharge, *or to refuse to rehire or recall* to active service in a suitable capacity an employee because of his or her rights or remedies granted to him or her by this Act." (Emphasis added.) 820 ILCS 305/4(h) (West 1992).

It has been held that section 4(h) of the Act enumerates three alternative causes of action that are applicable to distinct fact situations. *Webb v. County of Cook*, 275 Ill. App. 3d 674, 678 (1995). The *Webb* court announced: "An employee, whether regular or seasonal, who has been fired by his or her employer may generally only sue for retaliatory discharge. We distinguish the foregoing cause of action from those available where the employee has not, in fact, been fired. Where the employee has not been fired, a seasonal employee may only sue for retaliatory failure to rehire, and *a regular employee on leave or temporary layoff may only sue for retaliatory failure to recall*. Within the text of the Act, therefore, the terms 'rehire' and 'recall' should not be used interchangeably." (Emphasis added.) *Webb*, 275 Ill. App. 3d at 678. The court also noted that where a regular employee has been granted a leave, the employer's approval of his or her absence is *prima facie* evidence of that employee's reasonable

expectation of recall. *Webb*, 275 Ill. App. 3d at 677. Accordingly, if at the end of the leave period the employer fails to recall the employee, he or she may state a cause of action for retaliatory failure to recall. *Webb*, 275 Ill. App. 3d at 677-78.

Both parties agree that in order to support plaintiff's contention that the defendant refused to recall him to a suitable position, the plaintiff must show that there was a job available that plaintiff could have performed given his medical restrictions.

In *Wright v. St. John's Hospital of the Hospital Sisters of the Third Order of St. Francis*, 229 Ill. App. 3d 680 (1992), the plaintiff sued her employer, the defendant, for retaliatory discharge after she filed a workers' compensation claim. Although we recognize that the instant case is for retaliatory refusal to recall, we nevertheless find the *Wright* decision to be instructive in this case. In *Wright*, the plaintiff was an LPN and unable to perform an LPN's duties after a work-related back injury. The plaintiff claimed in her testimony that her limitations were only "slight." The plaintiff also admitted that her own physician informed her that she could not lift over 10 pounds. The hospital had established basic physical requirements that LPNs had to meet, and it did not establish multiple categories of LPNs—those who can do heavy lifting and those who cannot. The court stated: "The hospital's choice is neither unreasonable nor unlawful and may reflect sound administrative policy, providing for maximum flexibility in the utilization of LPNs throughout the hospital. In any event, the issue is one for the hospital, not the courts, to resolve." *Wright*, 229 Ill. App. 3d at 688. The *Wright* court did determine, however, that the plaintiff could assert a claim for the defendant's failure to assign her to "active service in a suitable capacity" pursuant to section 4(h) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.4(h)), *if such employment existed. Wright*, 229 Ill. App. 3d at 689-90. " 'The fact that defendant had no duty to rehire is irrelevant in retaliatory discharge or refusal to rehire or recall cases involving at-will employees since the material issue *is not whether* the employer has an obligation to retain a worker, *but why* the employer discharged the employee.' " (Emphasis by *Wright* court.) *Wright*, 229 Ill. App. 3d at 689, quoting *Motsch v. Pine Roofing Co.*, 178 Ill. App. 3d 169, 175 (1988). Causality does not exist if the basis for the refusal to recall is valid and nonpretextual.

We do not see this case as being any different than the *Wright* decision. Just as the plaintiff in the *Wright* case, this plaintiff claimed that his duties needed to be modified ever so slightly for him to be able to perform his job. As in the *Wright* decision, defendant's policy was not to allow a worker to return unless his medical release was

unrestricted. For this plaintiff to obtain a reversal of the circuit court's decision, he would have had to show that there was another available position for which he was qualified, and he has failed to do so.

Although plaintiff claims that he could perform the position of roof bolter with some modifications, a review of the record shows that plaintiff testified that he could not carry a bundle of five bolts as he normally would have done, but that he could carry one or two bolts at a time. He stated that he could not pry rock from the roof with a steel pry bar because of the weight of the steel. He claimed that he could have used a lighter pry bar made out of aluminum or fiberglass and that he had requested one on previous occasions and his requests were denied. Plaintiff stated that although he seldom had to bend a bolt, in certain places roof bolts had to be bent in order to insert the bolt into the roof and then straightened out to complete the insertion. He agreed that doing so would hurt his shoulder, but he suggested that perhaps another roof bolter could help him do that portion of his job. Plaintiff also claimed that he could not move steel water lines. We recognize that the plaintiff stated that moving steel water lines was not necessarily a "duty" of roof bolters; however, it is clear from the record that they are sometimes asked to do so. The fact remains that however slight plaintiff believed the modifications might be, he was unable to fully perform the position of roof bolter.

Furthermore, we fail to see how the plaintiff has introduced any evidence at trial that would establish a causal connection between his workers' compensation claim and the defendant's alleged refusal to recall him to a suitable position. In fact, it is undisputed that the position of roof bolter was available to the plaintiff and that he was called back to work in that capacity. The plaintiff has admitted in his pleadings, at trial, and on appeal that he could not perform the duties of a roof bolter without some modifications of the job. Plaintiff produced absolutely no evidence that there was an open and available position for which he was qualified. It is clear that defendant believed that plaintiff could perform all required duties and requested that he return to work. Plaintiff disagreed and refused to work because his physician, Dr. Wilkinson, had imposed certain restrictions on him while he was working. In fact, Dr. Wilkinson advised plaintiff to find another occupation. Defendant offered to send plaintiff to a mutually agreeable physician for a third opinion and be bound by that physician's opinion. Plaintiff refused to be examined and elected to rely solely upon Dr. Wilkinson's opinion. Hence, the plaintiff refused to return to work as a roof bolter without restrictions. Furthermore, it was defendant's policy not to allow its employees to return to work with restrictions.

■ It is clear that plaintiff has repeatedly admitted that he could not perform all of the job duties of a roof bolter within the medical restrictions that Dr. Wilkinson imposed upon him. Pursuant to Illinois law, an employer need not retain an at-will employee who is medically unable to return to his assigned position. *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 159 (1992). Under Illinois common law, an employer is not obligated to reassign such an employee to another position rather than terminate the employment. *Hartlein*, 151 Ill. 2d at 159. Similarly, an employer may fire an employee for excessive absenteeism, even if the absenteeism is caused by a compensable injury. *Hartlein*, 151 Ill. 2d at 160. "Simply put, 'Illinois law allows employers to act on the basis of their employee's physical disabilities; it is only the request for benefits that state law puts off limits as a ground of decision.' " *Hartlein*, 151 Ill. 2d at 160, quoting *McEwen v. Delta Air Lines, Inc.* (7th Cir. 1990), 919 F.2d 58, 60.

If Dr. Wilkinson's restrictions are valid, plaintiff could no longer perform his job. Under Illinois law, a plaintiff's inability to perform his job is a valid nonpretextual reason to terminate him; and likewise, it is a valid nonpretextual reason not to recall an employee.

We also note that much of plaintiff's brief is devoted to determining the issue of motive. In order to determine why the company denied plaintiff a job opportunity and did not recall him to a "suitable position," a suitable position must first exist. The only evidence presented by plaintiff of an open and available position was his former position as roof bolter. As we previously stated, plaintiff admitted that he could not perform all of the duties of a roof bolter; therefore, he was not qualified for the job opportunity.

After reviewing the evidence in a light most favorable to plaintiff, it is clear that the evidence so overwhelmingly favors the defendant that no contrary verdict based on the aforementioned evidence could ever stand.

We note that if the plaintiff believes that defendant has discriminated against him on the basis of a disability, his remedy is to file a charge with the Illinois Department of Human Rights (see *Mein v. Masonite Corp.*, 109 Ill. 2d 1 (1985)) or the Equal Employment Opportunity Commission (the Commission) (42 U.S.C.A. § 2000e *et seq.* (West 1994)). It is undisputed that plaintiff filed a claim against the defendant in federal court alleging that the defendant discriminated against him on the basis of his disability, in violation of the Americans with Disabilities Act of 1990 (42 U.S.C.A. § 12101 *et seq.* (West 1995)). See *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908 (7th Cir. 1996).

In light of the foregoing considerations, we affirm the Franklin

230

County circuit court's decision directing a verdict in favor of the defendant.

Affirmed.

RARICK and GOLDENHERSH, JJ., concur.