No. 5-95-0868

                                  IN THE

                        APPELLATE COURT OF ILLINOIS

                              FIFTH DISTRICT

_________________________________________________________________

                                     )

SHERI LYNN BANKS, Individually and as)  Appeal from the

Administrator of the Estate of       )  Circuit Court of

Jeffrey Lynn Banks, for the benefit  )  Effingham County.

of Sheri Lynn Banks and Brooke Shelby)

Banks,                               )

                                     )

     Plaintiff-Appellant,            )

                                     )

v.                                   )   No. 93-L-56

                                     )

RAMON CLIMACO, M.D.,                 )   Honorable

                                     )   Richard H. Brummer, 

     Defendant-Appellee.             )   Judge, presiding.  

_________________________________________________________________

     PRESIDING JUSTICE HOPKINS delivered the opinion of the court:

     Plaintiff, Sheri Lynn Banks, appeals from the jury's verdict

in favor of defendant, Ramon Climaco, M.D., in this medical

malpractice case.  Sheri, who is the widow of Jeffrey Lynn Banks,

appeals on her own behalf and in behalf of Brooke Shelby Banks,

Jeffrey's daughter.  Jeffrey died on October 28, 1991, at the

emergency room (ER) of St. Anthony's Memorial Hospital (St.

Anthony's) in Effingham, Illinois.  Dr. Climaco was the attending

physician on call when Jeffrey arrived at the ER at approximately

9:35 p.m. on October 27, 1991. 

     Plaintiff filed her multiple-count complaint alleging medical

malpractice by defendants Climaco and Ashokkumar Shah, the

anesthesiologist on duty the night of Jeffrey's death.  St.

Anthony's and nurse anesthetist James Kinney were named as

respondents in discovery, until they settled with plaintiff some

months before the trial.  Dr. Shah settled with plaintiff at the

close of all of the evidence.  Hence, during its deliberations the

jury considered only the liability of Dr. Climaco.

     On appeal, Sheri argues (1) that the trial court committed

reversible error by allowing evidence, argument, and a jury

instruction to the effect that the sole proximate cause of

Jeffrey's death was someone other than defendant Climaco; (2) that

the trial court erred in failing to grant her motion for mistrial,

which motion was based upon a newspaper disclosure of the pretrial

settlement of St. Anthony's; and (3) that the court erred in

failing to grant her motion for a directed verdict or for a

judgment notwithstanding the verdict.  For reasons we will more

fully explain, we affirm.  

                                 I. FACTS

              A. NEWSPAPER DISCLOSURE OF PRETRIAL SETTLEMENT

     Prior to the opening statements of the attorneys, the trial

judge told the 12 regular jurors and the two alternates that they

should avoid all media accounts of the trial and, in particular,

that they should avoid reading local newspapers and listening to

the local radio stations during the trial.  At the end of the first

day of the trial the jurors were admonished again to "avoid all

media contacts."  

     On the second day of trial, plaintiff's attorney moved for a

mistrial, on the basis of the following quote on the front page in

the previous day's afternoon edition of the local newspaper:

          "In the original lawsuit filed Jan. 11, 1994,

     several area doctors along with St. Anthony's Memorial

     Hospital were named as respondents in discovery in the

     lawsuit over the 1991 death of Jeffrey Banks.  Subsequent

     motions in the case involve a settlement made with the

     hospital, according to Charlene A. Cremeens, attorney for

     one of the defendants.  All others named as respondents

     in discovery *** have been dismissed, according to

     Cremeens." 

     Plaintiff's attorney argued that his case had been irreparably

prejudiced by the newspaper article, that the court should order a

mistrial immediately, since the jury had only heard one day of

testimony, and that he did not want to proceed with the trial,

which was expected to take a full two weeks.  Plaintiff's attorney

argued that in order to make a record after the trial was over, he

would have to "go out and basically interview the jurors and get

affidavits and file a motion and get the thing set up for appeal." 

The trial court denied the motion for mistrial, after individually

interviewing all 12 regular jurors and the two alternates.  None of

the jurors had read the newspaper article, except one of the

regular jurors, who was removed from the panel and replaced with

one of the alternates.  

                 B. EVIDENCE PRESENTED AT THE JURY TRIAL 

     Jeffrey arrived at the ER with a self-inflicted stab wound to

the abdomen.  At the ER, Dr. Climaco ordered a continuation of the

fluid therapy started by the ambulance staff and assessed his vital

signs.  Jeffrey's blood alcohol content was assessed at .22, his

breathing was labored, his blood pressure was within the normal

range, and his heart rate was abnormally high.  

     The respiratory therapist on duty that night, Jeffrey

Pietrzyk, continued the respiratory assistance given by the

ambulance staff, which was to assist Jeffrey's breathing with an

"ambu bag."  According to all accounts of the medical personnel at

the ER, Jeffrey was combative when he arrived at the ER and during

most of his time there.  As a result of his combativeness and since

the knife was secured in his abdomen prior to surgery, Jeffrey's

limbs were restrained during his entire time in the ER.   

     Climaco determined that Jeffrey required surgery to remove the

knife from his abdomen, a decision which none of the experts who

testified at trial criticized.  However, no surgeon was available

as soon as needed, so Climaco ordered Jeffrey transferred to Carle

Clinic in Champaign, Illinois, where the surgery was to be done. 

Prior to transfer, Climaco decided to intubate Jeffrey.  When a

patient is intubated, a respiratory tube is place in the patient's

mouth and into his trachea, so that he can be artificially

respirated.  Climaco's attempt to intubate Jeffrey at approximately

10 p.m. was unsuccessful.  As a result, Climaco called for an

anesthesiologist to perform the intubation.  At approximately 10:30

p.m., a nurse anesthetist, James Kinney, came in and also unsuc-

cessfully tried to intubate Jeffrey.  Starting at 10:30 p.m., Dr.

Climaco ordered that Jeffrey be given valium to sedate him.

     When Shah, the anesthesiologist, arrived at 11:07 p.m., he

talked briefly with his nurse anesthetist and then ordered

succinylcholine, a drug that temporarily paralyzes a patient,

including his ability to breathe on his own, in order to accomplish

the intubation.  Before Jeffrey was given the succinylcholine, he

was preoxygenated, i.e., he was given additional oxygen to avoid

problems with the period during which he could not breathe, which

occurs before the endotracheal tube is in place and working

properly.  Shah placed the endotracheal tube in Jeffrey's throat,

and Pietrzyk listened for Jeffrey's breath sounds.  Pietrzyk

testified that when he did not hear the proper breath sounds, he

told Shah that the tube was in the wrong place, in the esophagus

instead of the trachea.  Pietrzyk testified that Shah insisted that

the tube was in the right place.  

     Pietrzyk continued to assist Jeffrey's breathing with the ambu

bag but still could not hear any breath sounds, so again, he told

Shah that the tube was in the wrong place.  At the same time,

Pietrzyk noticed that Jeffrey's stomach was becoming noticeably

distended, which is a sign of an improper esophageal intubation, as

the air is entering the stomach rather than the lungs.  According

to Pietrzyk, Shah did not respond to him, so Pietrzyk again

suggested that Shah should check the placement of the tube, at

which time Shah walked out of the room.  Shortly after Shah left,

according to Pietrzyk's account, Jeffrey's heart rate went down to

30 to 40 beats per minute, which is dangerously low.  Pietrzyk then

called for a "code," which is done when the hospital personnel

determine that the patient will die if not given immediate

assistance.  Pietrzyk testified that the nurse anesthetist then

listened for the breath sounds and, hearing nothing, took out the

improperly placed tube and correctly reintubated Jeffrey.  Pietrzyk

estimated that about five to six minutes elapsed before the second

tube was properly placed.  Jeffrey was given cardiopulmonary

resuscitation, but he never revived.   

     Both Climaco and Shah testified.  In addition to the factual

summary we have just set forth, Climaco testified that he was also

treating other patients in the ER on October 27, 1991, and that he

was in and out of Jeffrey's room at least five times that evening. 

Climaco's initial treatment of Jeffrey was to give fluids intrave-

nously, since he assumed that Jeffrey had "massive bleeding" due to

the stab wound.  Climaco testified that at approximately 10 p.m.,

the volume of the IV fluids was decreased, as Jeffrey's vital signs

had stabilized by that time.  Climaco testified that he never

listened for rales or other problematic lung sounds after 10 p.m.

and that he never considered pulmonary edema as a possible

diagnosis.  Climaco was not present when Shah was intubating

Jeffrey.  He came back into the room after the code was called.

     Shah's testimony directly conflicts with that of Pietrzyk, the

respiratory therapist.  In particular, Shah remembered only one

instance in which Pietrzyk said that he could not hear any breath

sounds.  Shah testified that when Pietrzyk said that he could not

hear any breath sounds, Shah listened for breath sounds himself and

realized that Pietrzyk was right.  Shah's nurse anesthetist then

immediately corrected the tube placement.  Shah estimated that only

1 to 1½ minutes elapsed between the first intubation and the

second.  When Shah administered the succinylcholine and performed

the first intubation, he had not talked to Climaco, had not checked

Jeffrey's ER records, did not know how much fluid Jeffrey had been

given, had not inquired whether the ER had certain oxygen monitor-

ing equipment available to use, and did not know the level of

oxygen in Jeffrey's blood.  Shah admitted that succinylcholine can

cause a person's heart rate to become dangerously slow and that if

given to an impaired patient, the decreased heart rate can end in

cardiac arrest. 

     Shah testified that he was present when Jeffrey's heart rate

went down to 30 or 40 and that he responded by administering

atropine to increase the heart rate.  The heart monitor used on

Jeffrey indicates that his heart rate increased to 73 briefly after

the atropine was given.  Shah admitted that he left the ER when

Jeffrey's heart rate came back up, even though he knew that the

effect of atropine wears off very quickly and even though he felt

it was his duty to stay with the patient until he is stable and out

of danger.  Shah admitted that he did not check to see if Jeffrey's

stomach was distended before he left and that he was already gone

when the code was called. 

     The testimony of James Kinney, the nurse anesthetist, was

essentially the same as that given by Shah, except Kinney estimated

that the amount of time between the improper and the successful

intubations may have been about five minutes, but he stated that he

really did not know how long it took.  According to Kinney, Shah

was present through the second intubation and remained until

Jeffrey was stable and was making feeble attempts to return to

normal breathing.  A few minutes after Shah left, before the code

was called, Kinney also left.   

                            C. EXPERT TESTIMONY

     Plaintiff called four expert witnesses.  First, Dr. John

Heidingsfelder, a forensic pathologist, testified that Jeffrey died

of pulmonary edema, or fluid accumulation in the lungs.  According

to Heidingsfelder, at the time of the intubation, Jeffrey went into

heart failure due to the huge amount of fluid in his lungs. 

Heidingsfelder did not attribute Jeffrey's death to Shah's improper

esophageal intubation.  Specifically, Heidingsfelder testified that

even if the esophageal intubation lasted from five to six minutes,

he believed that Jeffrey died from fluid overload and pulmonary

edema.

     Second, James Matthews, M.D., testified that Climaco deviated

from the accepted standard of care applicable to an ER doctor in

Effingham, Illinois, in two ways: (1) he gave too much fluid to

Jeffrey, and (2) he should have been present during the intubation. 

Matthews testified that various test results showed that Jeffrey

was not bleeding internally and, therefore, did not need the large

volume of fluid given.  Additionally, considering the high level of

alcohol and valium in Jeffrey's system, he should have been

sedated.  Since Jeffrey was combative, Matthews felt that the

agitation was probably due to fluid overload, which can adversely

affect respiration, especially when the patient is laying flat on

his back, as was Jeffrey.  According to Matthews, the cause of

Jeffrey's death was a combination of hypoxia, or a low level of

oxygen in the bloodstream, which was brought on by the fluid

overload, and the esophageal intubation.

     Third, in the opinion of Dr. Graham, a forensic pathologist,

Mr. Bank's death was caused by the failure of his brain to get

enough oxygen when the intubation tube was placed into his

esophagus instead of his trachea. 

     The fourth expert to testify for plaintiff was Dr. Leon Ampel,

an anesthesiologist, who testified that Jeffrey's death was caused

by a combination of the fluid overload, which was Climaco's

responsibility and which forced Jeffrey into pulmonary edema, and

Shah's improper esophageal intubation.  Ampel specifically

testified that at the time of Shah's intubation, Jeffrey was not on

the verge of death due to the fluid overload, but for the amount of

the fluid he was given, he was improperly monitored.   

     Climaco called Daniel Sullivan, M.D., an ER doctor, as his

expert witness.  The trial court instructed the jury that Sullivan

was called as an expert witness by Climaco to testify regarding Dr.

Climaco's treatment and that his testimony was not to be considered

as it related to any deviation of the standard of care by Shah. 

Sullivan testified that, in his opinion, Jeffrey's death was caused

by a cardiac arrest due to either the succinylcholine or the

esophageal intubation.  In Sullivan's opinion, the fluids given by

Climaco prior to 11:10 p.m., when the code was called, did not

cause or contribute to Jeffrey's death.  Finally, the treatment

provided by Climaco did not violate the applicable standard of

care. 

                           D. JURY INSTRUCTIONS

     The trial court read the following instruction to the jury

after Shah's testimony and subsequent settlement and before the

closing arguments:

     "THE COURT:  Members of the jury, A. Shah, M.D., is no

     longer a party to this action.  You should not concern

     yourselves with this fact nor speculate regarding the

     reasons for this.  The fact that A. Shah, M.D., is no

     longer a party to this action should not affect your

     consideration of damages, if any, to be awarded to

     plaintiff if you find from the evidence that the remain-

     ing defendant, Ramon Climaco, M.D., is liable to the

     plaintiff in accordance with the court's instructions."

     During a conference with the trial court, out of the hearing

of the jury, plaintiff's attorney renewed his motion in limine to

bar any evidence or argument concerning any nonparty, which at that

time included Shah, since he had settled with plaintiff.  Climaco's

attorney objected, stating that it "would be clearly inappropriate

to preclude me from now talking about the testimony that this jury

has heard" about Shah's alleged negligence.  Climaco's attorney

stated that his affirmative defenses "go to sole proximate cause,

so to preclude me from commenting upon the testimony that this jury

has heard I think would be clearly improper."  The trial court

denied plaintiff's motion to bar evidence and argument regarding

nonparties.  

     Additionally, the court denied plaintiff's motion that the

jury should be given only the first paragraph of Illinois Pattern

Jury Instructions, Civil, No. 12.05 (3d ed. 1994) (hereinafter IPI

Civil 3d No. 12.05).  The instruction given to the jury, over

plaintiff's objection, is as follows:

          "If you decide that the defendant was negligent and

     that his negligence was a proximate cause of death to the

     plaintiff, it is not a defense that something else may

     also have been a cause of the death.

          However, if you decide that the sole proximate cause

     of death to the plaintiff was something other than the

     conduct of the defendant, then your verdict should be for

     the defendant."

The jury was also instructed that plaintiff was claiming that

Climaco was "a proximate cause of the death of Jeffrey Banks"

(emphasis added) and that defendant was asserting "the affirmative

defense that the sole proximate cause of Jeffrey Banks' death was

the conduct of A. Shah, M.D.," (emphasis added) and that defendant

had the burden of proving his affirmative defense.

     The jury returned a verdict in favor of Dr. Climaco.  It is

from this verdict that plaintiff appeals.

                               II. ANALYSIS

                          A. SOLE PROXIMATE CAUSE

     The pivotal issue in this case is whether defendant Climaco

presented enough evidence to support his sole-proximate-cause

affirmative defense and jury instruction.  Plaintiff argues that at

the time this case went to trial, the applicable law on this issue

was stated in two Fifth District cases:  Grimming v. Alton &

Southern Ry. Co., 204 Ill. App. 3d 961 (1990), and Robertson v.

General Tire & Rubber Co., 123 Ill. App. 3d 11 (1984).  Plaintiff

argues that under Grimming and Robertson, "it is not a proper

defense that a non-party to the litigation is liable for negligence

and it is improper for the jury to be instructed that it is a valid

defense."  Grimming, 204 Ill. App. 3d 961; Robertson, 123 Ill. App.

3d 11.  

     Plaintiff is correct that Grimming and Robertson both hold

that a defendant should not be allowed to use an affirmative

defense that the sole proximate cause of plaintiff's injury is due

to the actions of a nonparty, unless the defendant has availed

himself of the remedy of either a counterclaim or third-party

action against the nonparty.  Grimming, 204 Ill. App. 3d at 984-85;

Robertson, 123 Ill. App. 3d at 16-17.  However, neither Grimming

nor Robertson clearly supports plaintiff's argument that the sole-

proximate-cause instruction given in the case at bar was improper. 

Additionally, our supreme court has clearly stated, in Leonardi v.

Loyola University of Chicago, 168 Ill. 2d 83 (1995), that even a

general denial of liability by a defendant, without an affirmative

defense or counterclaim or third-party action, is "sufficient to

permit the defendant in support of his position to present evidence

that the injury was the result of another cause."  Leonardi, 168

Ill. 2d at 94.  

     Hence, plaintiff's argument that the trial court erred in

denying plaintiff's motion to strike Climaco's affirmative defense,

i.e., that Shah was the sole proximate cause of Jeffrey's death,

fails.  Leonardi makes it clear that Climaco had no burden to file

a sole-proximate-cause affirmative defense and that he was entitled

to present evidence regarding Shah's responsibility for Jeffrey's

death, based upon his general denial of liability in his answer.

Leonardi, 168 Ill. 2d at 93-94.  "A defendant has the right not

only to rebut evidence tending to show that defendant's acts are

negligent and the proximate cause of claimed injuries, but also ***

to endeavor to establish by competent evidence that the conduct of

a third person, or some other causative factor, is the sole

proximate cause of plaintiff's injuries."  Leonardi, 168 Ill. 2d at

93-94.

     Plaintiff argues that Leonardi does not apply to the case at

bar, as it considered the use of Illinois Pattern Jury Instruc-

tions, Civil, No. 12.04 (3d ed. 1994) (hereinafter IPI Civil 3d No.

12.04), rather than IPI Civil 3d No. 12.05.  However, we find that

Leonardi is instructive and controlling on both the issue of the

sole-proximate-cause affirmative defense and the jury instruction. 

In Leonardi, also a medical malpractice case, the plaintiff argued

that the jury should be given only the first paragraph of IPI Civil

3d No. 12.04.  The second paragraph of IPI Civil 3d No. 12.04, used

in Leonardi, refers to the "conduct of some person other than the

defendant" as the sole proximate cause of plaintiff's injury,

whereas the second paragraph of IPI Civil 3d No. 12.05, used in the

instant case, refers to "something other than the conduct of the

defendant" as the sole proximate cause of plaintiff's injury.  The

language of IPI Civil 3d No. 12.05 is more comprehensive than the

language of IPI Civil 3d No. 12.04, as "something other than the

conduct of the defendant" may include the conduct of a nonparty

such as Dr. Shah.  That IPI Civil 3d No. 12.05 refers to "something

other than the conduct of the defendant," rather than the more

specific "conduct of some person other than the defendant" of IPI

Civil 3d No. 12.04, is a distinction without meaning as applied to

the facts of this case. 

     We now consider whether the evidence in this case was

sufficient to warrant giving the jury the sole-proximate-cause

instruction.  If the jury was presented some competent evidence

tending to support Climaco's theory that Shah was the sole

proximate cause of Jeffrey's death, then the instruction was

proper.  Leonardi, 168 Ill. 2d at 101; French v. City of Spring-

field, 5 Ill. App. 3d 368, 374 (1972).  

     The standard for proving negligence in a medical malpractice

case is:  "[T]he plaintiff, by the use of expert testimony, must

establish the standards of care against which the defendant

doctor's conduct is measured.  The plaintiff must further prove by

affirmative evidence that, judged in the light of these standards,

the doctor was unskillful or negligent and that his want of skill

or care caused the injury to the plaintiff."  Borowski v. Von

Solbrig, 60 Ill. 2d 418, 423 (1975).  Clearly, where a defendant

seeks to prove that someone or something other than he is the sole

proximate cause of plaintiff's injury or death, the standard

enunciated in Borowski applies equally to that defendant as to the

plaintiff.  In order to prevail on that point and in order to be

entitled to the second paragraph of IPI Civil 3d No. 12.05, the

defendant must produce evidence that the sole proximate cause of

the plaintiff's injury was something other than the defendant's

conduct.  In the case at bar, Dr. Graham testified that, in his

opinion, to a reasonable degree of medical certainty, Jeffrey's

death was the result of the esophageal intubation performed by

Shah.  Thus, the jury heard expert testimony, which, if believed,

supported Climaco's theory that Shah was responsible for Jeffrey's

death, and the instruction was properly given. 

     Moreover, the ultimate test for determining the propriety of

any jury instruction is whether all of the instructions, when read

as a whole, fairly, fully, and comprehensively informed the jury of

the relevant principles of law (Leonardi, 168 Ill. 2d at 100)

without misleading or confusing the jury.  McCall v. Chicago Board

of Education, 228 Ill. App. 3d 803, 810 (1992).  Here, plaintiff

does not argue that the sole-proximate-cause instruction was

confusing or misleading, and from our review of the record, we find

that the jury was fairly, fully, and comprehensively instructed as

to the relevant principles of law.  As such, the trial court did

not abuse its discretion in allowing the jury to be instructed as

to the second paragraph of IPI Civil 3d No. 12.05.

                          B. MOTION FOR MISTRIAL

     Plaintiff argues that the trial court erred in denying her

motion for mistrial, which was based upon the account of the

pretrial settlement of St. Anthony's in the local newspaper on the

first day of trial.  Plaintiff's argument fails.

     "A mistrial should be declared only as the result of some

     occurrence of such character and magnitude that a party

     is deprived of its right to a fair trial, and the moving

     party must demonstrate actual prejudice as a result of

     the ruling or occurrence.  [Citation.]  The trial court's

     ruling on a motion for mistrial will not be disturbed

     upon appellate review absent a clear abuse of discre-

     tion."  Baker v. CSX Transportation, Inc., 221 Ill. App.

     3d 121, 138 (1991).

     There is nothing in the record to indicate any pretrial order

prohibiting any of the attorneys from talking to the press about

the settlement with the hospital or any other aspect of the case. 

In oral arguments before this court, plaintiff's attorney indicated

that all of the parties agreed before the trial, in a pretrial

hearing, that the settlement with the hospital would not be raised

in any way before the jury.  However, there are no transcripts of

any pretrial proceedings in the record on appeal, and there is no

written order or docket entry in this record to support plaintiff's

contention. 

     In conclusion on this point, although we certainly do not

approve of defense counsel's discussion of the settlement with the

press, we conclude that the trial court's denial of the motion for

a mistrial was not an abuse of discretion.

                     C.  MOTION FOR DIRECTED VERDICT 

     Plaintiff argues that the trial court erred in denying her

motion for directed verdict and her motion for a judgment notwith-

standing the verdict, since the evidence established that the

negligence of Dr. Climaco was a proximate cause of Jeffrey's death

and the evidence did not support any conclusion that Shah's conduct

was the sole proximate cause of Jeffrey's death.  The law is

settled that a verdict should be directed and a judgment notwith-

standing the verdict should be entered only in those cases in which

all of the evidence, when viewed in the light most favorable to the

opponent of the motions, "`so overwhelmingly favors movant that no

contrary verdict based on that evidence could ever stand.'" 

Johnson v. National Super Markets, Inc., 257 Ill. App. 3d 1011,

1014 (1994), quoting from Pedrick v. Peoria & Eastern R.R. Co., 37

Ill. 2d 494, 510 (1967).

     It is clear in this case that the jury could reasonably

conclude, based upon the evidence, that Shah was the sole proximate

cause of Jeffrey's death and that Climaco's conduct did not

proximately cause his death.  When viewed in the light most

favorable to Climaco, the evidence, which we have previously set

forth at some length, supports the jury's verdict.  Moreover, the

jury was presented with highly conflicting testimony by occurrence

witnesses and differing opinions by expert witnesses.  It was the

jury's province to resolve these differences by deciding which

testimony to believe and which to reject.  The trial court did not

abuse its discretion in denying plaintiff's motions for directed

verdict and for judgment notwithstanding the verdict.  See Maple v.

Gustafson, 151 Ill. 2d 445 (1992).

                              III. CONCLUSION

     For all of the reasons stated, we affirm the judgment of the

trial court.

     Affirmed.

     CHAPMAN, J., and MAAG, J., concur.

                                      ATTACH A FRONT SHEET TO EACH CASE

___________________________________________________________________________

                                 NO. 5-95-0868

                                     IN THE

                          APPELLATE COURT OF ILLINOIS

                                 FIFTH DISTRICT

___________________________________________________________________________

SHERI LYNN BANKS, Individually and as)  Appeal from the

Administrator of the Estate of       )  Circuit Court of

Jeffrey Lynn Banks, for the benefit  )  Effingham County.

of Sheri Lynn Banks and Brooke Shelby)

Banks,                               )

                                     )

     Plaintiff-Appellant,            )

                                     )

v.                                   )   No. 93-L-56

                                     )

RAMON CLIMACO, M.D.,                 )   Honorable

                                     )   Richard H. Brummer, 

     Defendant-Appellee.             )   Judge, presiding.  

___________________________________________________________________________

Opinion Filed:                 September 5, 1996

___________________________________________________________________________

Justices:      Honorable Terrence J. Hopkins, P.J.

                         

               Honorable Charles W. Chapman, J., and

               Honorable Gordon E. Maag, J.,

               Concur

___________________________________________________________________________

                         

Attorneys      Stephen R. Kaufmann, Sorling, Northrup, Hanna, Cullen and

for            Cochran Ltd., Suite 800 Illinois Building, P.O. Box 5131, 

Appellant      Springfield, IL 62705; Ian Christopherson, Christopherson

               Law Offices, 515 South Third Street, Las Vegas, NV  89101

___________________________________________________________________________

Attorneys      Charlene A. Cremeens, Brad G. Pelc, Cremeens & Associates,

for            500 Fullerton Road, P.O. Box 23350, Belleville, IL 62223-

Appellee       3350

___________________________________________________________________________